AMERICAN STOKER CO. v. UNDERFEED STOKER CO. OF AMERICA et al.

(Circuit Court, W. D. Pennsylvania. October 27, 1910.)

No. 10.

1. COURTS (§ 268*)—SUITS FOR INFRINGEMENT OF PATENT—JURISDICTION AND VENUE.

Under Act March 3, 1897, c. 395, 29 Stat. 695 (U. S. Comp. St. 1901, p. 588), which provides that in suits for infringement the Circuit Courts shall have jurisdiction in the district of which the defendant is an inhabitant or in any district in which the defendant shall have committed acts of infringement and have a regular and established place of business, a court has jurisdiction in a district where defendant has an established place of business from which it sold the alleged infringing articles, and in which it also assembled the different parts of such articles.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 806, 807, 809; Dec. Dig. § 268.*]

2. PATENTS (§ 210*)—IMPLIED LICENSE—RELATION OF PARTIES.

The fact that the patentee of a furnace was at the time president of a corporation engaged in making furnaces does not entitle the company to the right to use the invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 301, 302; Dec. Dig. § 210.*

Right to inventions as between employer and employé, see note to Pressed Steel Car Co. v. Hansen, 71 C. C. A. 221.]

3. PATENTS (§ 240*)—CONSTRUCTION—EQUIVALENTS—IMPROVEMENT PATENTS.

A patentee of an improvement on a prior combination by adding thereto a single new element is not entitled to claim equivalents to the same extent as the patentee of the original combination.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 379; Dec. Dig. § 240.*]

4. PATENTS (§ 234*)—INFRINGEMENT—IDENTITY OF FORM.

A structure may be within the letter of a patent and still not be an infringement, where it operates on a different principle and is intended for a different purpose.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 370–381; Dec. Dig. § 234.*]

5. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—UNDERFEED FURNACE.

The Garden patent, No. 648,251, for an underfeed furnace, is for an improvement on the furnace of the Jones patent, No. 470,052, which consists of entirely covering or sealing the grate space between the sides of the fuel conduit and the side walls of the furnace for the purpose of preventing the admission of air except through the air openings within or adjacent to the conduit. It was not anticipated, and the invention was novel and useful; but it cannot be broadened to cover a furnace wherein the grates at the sides of the conduit are only partially covered. As so construed, *held* not infringed.

In Equity. Suit by the American Stoker Company against the Underfeed Stoker Company of America and David Hunter, Jr. Decree for defendants.

H. C. Lord, for complainant.

Walter H. Chamberlin and Frederick P. Fish, for defendants.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

YOUNG, District Judge. This is a suit in equity by the American Stoker Company for the infringement of letters patent to James Garden, April 24, 1900, No. 648,251, and is for an improvement of the Jones patent, No. 470,052. There are some preliminary questions necessary to the complainant's prima facie case which should be disposed of before taking up the question of infringement.

The first is the question of jurisdiction. The complainant, the American Stoker Company, is a corporation organized and existing under the laws of the state of New York, and, of the defendants, the Underfeed Stoker Company is a corporation organized and existing under the laws of the state of New Jersey, having its place of business in Chicago, and the other defendant, David Hunter, Jr., is a resident of the Western district of Pennsylvania. The answer admits the place of residence of the individual. The evidence shows that the defendant corporation maintained an office in the city of Pittsburgh in the Western district of Pennsylvania since the summer of 1893. The evidence also shows that the defendant corporation sold for delivery in the city of Pittsburgh, the property to remain in vendor until accepted, the devices which were claimed to infringe the complainant's patent, assembled the different parts of these devices in the Western district of Pennsylvania, and thus not only did business there by way of sale, but in some sense and to some extent manufactured in that district. There has been a general appearance for the defendant, and, while this in some circuits is a waiver of jurisdiction, this rule has not obtained in this circuit, as indicated in Gray v. Grinberg, 159 Fed. 138, 86 C. C. A. 328. The rule covering jurisdiction is laid down in Westinghouse Electric & Manufacturing Company v. Stanley Electric Manufacturing Company (C. C.) 116 Fed. 641, where Judge Lacombe says:

"The act of March 3, 1897 [Act March 3, 1897, c. 395, 29 Stat. 695 (U. S. Comp. St. 1901, p. 588)], provides that in suits brought for infringement of patent the Circuit Courts shall have jurisdiction in the district of which defendant is an inhabitant, or in any district in which the defendant shall have committed acts of infringement, and have a regular and established place of business. The defendant company is a New Jersey corporation; therefore it is not an inhabitant of the Southern district of New York. It has a regular and established place of business here; but, in order to maintain its right to the relief prayed for from this court, complainant must show clearly the commission by defendant company of acts of infringement here."

The evidence in this case shows that the defendant had an established place of businesss within the district at the time suit was brought and has committed acts of infringement within this district. This court, therefore, has jurisdiction of the case.

The second is the question of title. The testimony very clearly and conclusively shows that the patent obtained by James Garden by different assignments finally came into the ownership of the American Stoker Company, the complainant. I must therefore conclude that the jurisdiction was in this court to entertain the suit, and that the ownership of letters patent is established.

Another question preliminary to the decision of the case is the question of the admission of certain evidence; it being claimed on the part of defendant that certain evidence introduced by the complainant was not rebuttal, and the counter charge made on the part of complainant

that certain evidence introduced by defendant was not surrebuttal. Perhaps objections might be made to the admission of much of the testimony because not strictly rebuttal or surrebuttal; but I am inclined to admit the testimony for the reason that, after all the testimony almost of the case had been taken, complainant amended its bill, which necessitated an amendment of the defendants' answer and required the retaking of all the evidence in the case. Counsel for the respective parties naturally supplemented their evidence already taken and probably did so without regard to order. The case having been reopened, I do not feel that it would be just in this case to draw the line closely as to whether or not the evidence was rebuttal or surrebuttal, but will consider all the evidence in the case. This disposes of all the preliminary questions.

In order to make out a prima facie case, it became necessary for the complainant to prove what the Garden patent covers and its infringement by the defendants. This must be determined by the construction of the claims, of which there are three, as follows:

"1. A sealed or grateless underfeed furnace in which is combined a fuel conduit adapted to feed the fuel from beneath, means for introducing the fuel thereto, air openings within or in operative proximity to said conduit, means for forcing air into the furnace through said openings, laterally projecting sealed or air-tight ledges over which the fuel may spread and be consumed when forced upwardly through the conduit, and means for preventing the admission of air except through said air openings within or adjacent to the conduit, whereby air may be introduced under pressure, a backward flow of gases prevented and combustion insured, substantially as set forth.

"2. The combination with a furnace of the class described, of an underfeed conduit, means for introducing fuel thereto, means for introducing a blast of air to openings adjacent to the conduit, and dead-plates forming laterally-projecting air-tight ledges for the reception and support of the fuel, substantially as set forth.

"3. The combination with a furnace of an underfeed conduit, means for introducing a blast of air to openings adjacent to the conduit, the bottom of said furnace being entirely closed adjacent to the sides of said conduit."

While we may not look to the specification for the purpose of enlarging the claims, we may look to it for the purpose of learning exactly what the applicant intended to have patented as set out in his claims. In his specification he says:

"The primary object of my invention is to so construct a furnace, in combination with an underfeed mechanical stoker, that the air may be supplied to the furnace at the point of combustion, while at the same time the gases formed may be prevented from returning or escaping otherwise than through the flue or stack designed therefor."

He further says:

"As the air is forced into the furnace through the means described, a back or downward pressure is produced, which is sufficient to force the air and gas downward through the ordinary grate heretofore employed and thence into the furnace room. This objectionable feature often becomes so serious as to destroy the grate bars in a few minutes, besides causing the escape of the noxious gases in such a way as to cause inconvenience, if not positive injury, to the attendants. In order to obviate this objection, I have in my improved construction dispensed with the usual grate, and in lieu thereof I have sealed or closed the space occupied thereby, preferably by placing upon each side of the tuyères a dead-plate, $1^1 1^2$, which serve to strengthen the plate, while those

upon the top permit a sufficient amount of ashes to accumulate to protect the plates from the heat of the furnace."

He further says:

"In lieu of the cast metal dead-plates, the bottom of the furnace may be built up solidly with fire brick, except the air passages leading to the tuyères, thus leaving no opening corresponding to the usual ash pit beneath; but I prefer the construction shown, as it may the more readily be repaired."

He further says:

"As a result of the construction described, it will be observed that the flat ledge or shelf is formed upon each side of the conduit corresponding to the ordinary grate surface over which the fuel spreads as it is fed into the conduits, and, as sufficient air is admitted through the tuyères to support combustion, the fuel is not only entirely consumed, but, as no air is admitted in the usual way through the front of the furnace, the fire may be more perfectly controlled."

To fully understand the patent of Garden, it is necessary to view it in the light of the Jones patent, No. 470,052. The Jones patent is a fundamental one for an underfeed furnace, and as described and construed by Judge Brown, in Underfeed Stoker Company v. American Ship Windlass Co. (C. C.) 165 Fed. 65, is for, as described in claim 6 of that patent:

"A furnace provided with a fuel chamber or magazine, and provided with perforated pipes or tuyères connected with a pipe of an air-supplying apparatus whereby air is forced under pressure directly over said fuel chamber and under and through the burning coal, and with a device for forcing the fresh coal up into the fire, substantially as described."

And as described in the ninth claim thereof:

"A furnace provided with an upwardly-expanding chamber, closed at bottom and sides, having connection with an air-supplying apparatus at or near its top whereby the fresh or green fuel is confined while air is being forced first over the top of the fresh fuel below the mass of burning fuel and through the burning fuel, in combination with a device for forcing fresh fuel up into the burning fuel, substantially as described."

It will thus appear, by comparison of the claims of the Garden patent with the Jones patent, that the Garden patent was for an improvement upon the Jones patent. The elements making up the Jones patent were used by Garden, and the new feature claimed by him is the total covering of the grate space between the sides of the fuel magazine or conduit and the side walls of the furnace for the purpose of "preventing the admission of air except through the air openings within or adjacent to the conduit, whereby air may be introduced under pressure, the backflow of gases prevented, and combustion insured." He takes the combination of the Jones patent with all of its elements and attempts to make a new combination by the introduction of what he claims is a new element, viz., the covering of the grate space for the purposes described. Considering then the claims of the Garden patent in the light of the specification, and aided by an understanding of the Jones patent, we conclude that the Garden patent is to be considered as:

"A sealed or grateless furnace having sealed or air-tight ledges laterally projecting from the conduit, with means for preventing the admission of air,

except through air openings within or adjacent to the conduits, so that air may be introduced under pressure and a backflow of gases prevented and combustion insured."

The construction now asked for claims 2 and 3 would have the effect of broadening the applicant's invention so as to cover a furnace wherein the grates at the side of the conduit were only partially covered. These claims, in the light of the specification, which indicates a sealed furnace, the entire grate space between the conduit and the side wall being covered so as to prevent any backflow of gas and so as to prevent any admission of air through the grates, cannot be so construed. It is so apparent by the apt language of the specification that the applicant was seeking to obtain a patent for a sealed furnace, which would prevent either the backflow of the smoke and gas or the upflow of air from the ash box, that to construe these claims as claims for the partially covered grate space which would not prevent either the downflow of gas or the upflow of air, except in so far as the accumulation of ashes might do so, would be a contradiction not only of the intention of the applicant, as stated at length in his specification, but also a contradiction of his first claim.

James Burke, an expert called by complainant, interprets the second and third claims as covering a sealed furnace just as claim 1 does. In his testimony, on page 58 of complainant's record, he says:

"The problem was to overcome these serious objections, which was solved by dispensing with the usual grate and introducing means for sealing the space usually occupied by grates. One means of carrying this out, described and shown, is by placing a dead-plate, referred to as '1,' upon each side of the tuyères. These dead-plates are supported on suitable flanges or lugs, or any suitable supports, and form closed ledges or shelves, extending from each side of the conduit towards the sides of the furnace, forming lateral supports extending from the upper part of the retort, and upon which the burning fuel spreads. As these dead-plates form closed structures, the air and gas is prevented from passing downwardly through them.

"The patent describes another method of accomplishing the sealing, by building up the bottom of the furnace solidly, with fire brick, except the air passages leading to the tuyères, in which case this solid structure, which would extend laterally from the upper part of the conduit towards the sides of the furnace, would be used instead of the dead-plates.

"It will be seen that by the introduction of the dead-plates forming lateral shelves, or by building up a solid structure from the bottom of the furnace, the air and gas is prevented from coming downwards, as it cannot flow through the dead-plates or solid structure, and that the objectionable feature and bad results from the downward flow of the gas has thus been overcome."

In claims 1 and 2 the sealing, in order to prevent the downflow of gas, was effected by "laterally projecting sealed air-tight ledges," and in claim 3 by the bottom of the furnace being entirely closed adjacent to the sides of the conduit. These are interpreted by Burke, as to claims 1 and 2, in his testimony, on page 59 of complainant's record, where he says:

"The sealing of the furnace by the dead-plates forms means for preventing the admission of air except through said openings within or adjacent to the conduit, thus permitting of the air being introduced under pressure, which pressure is produced by the suitable fan referred to. The sealing of the bottom of the furnace, and the use of the dead-plate, brings about the condition that a backflow of gas is prevented.. The supplying of the air through the

opening 'i¹', and causing it to flow at the desired place for proper combustion, results in the condition of combustion assured."

And as to claim 3, on page 60, where he says:

"The specification describes the plan of building up the bottom of the furnace solidly with fire brick, excepting the air passages leading to the tuyères, thus forming the condition of the bottom of said furnace being entirely closed adjacent to the sides of said conduit."

I am of opinion that this interpretation is more sound and consistent with the specifications and claims of the patent than the interpretation subsequently sought to be placed upon the claims by the witness Ball, called as an expert by the complainant six months after Burke had testified. On page 201 of complainant's record, we find the testimony of this witness, as follows:

"Q. 7. If I understand you correctly, you are of the opinion that the structure defined by the first claim of the patent in suit is one in which the grate surfaces are entirely sealed, so as to prevent the admission of air except through the tuyères, while the second claim describes or includes structure in which the air-tight ledges adjacent to the retort do not extend to the side walls, or, in other words, a structure in which there is an air opening along the side walls. So far as combustion is concerned, is the efficiency of the furnace increased or diminished by reason of the opening near the side wall, as distinguished from a furnace in which the entire grates are sealed? (Question is objected to as calling for new evidence not proper in rebuttal.) A. My understanding of the first and second claims, in regard to the ledges or dead-plates, is the same as you have described in your question."

I am therefore clearly of opinion that James Garden's patent covers a sealed furnace as described in claim 1, and that claim 2 is identical with claim 1, and that claim 3 covers the same thing accomplished in a different way, viz., by sealing up the ash box between the side walls and air passages adjacent to the conduit. All the claims cover a sealed furnace and do not include the partial covering of the space between the conduit and the side walls.

His invention is to construct a furnace in combination with an underfeed mechanical stoker so that the air may be furnished at the point of combustion within or adjacent to the conduit. The furnace so sealed is to prevent any upflow of air from beneath the furnace and any backflow of gas from the furnace during the combustion.

The date of the patent, unless there is evidence to carry it back, is of October 20, 1894. Counsel for complainant sought to carry it back to the date of the installation upon the tug Ewing in September, 1893. We have searched the evidence in this case thoroughly to determine whether complainant has established any earlier date than the date of his application, and we find in the evidence that prior to his application, in September, 1893, he experimentally sealed the entire grate space upon the tug Ewing, but upon the tug Perfection later, in February, 1894, he removed the grates and filled the space with brick and clay. His own evidence is corroborated by that of Johnson and Carroll and is sufficient to satisfy us that his intention was to cover the entire grate surface for the purpose of preventing the upflow of air or downflow of gas. The date of the Garden patent is carried back in our opinion to not later than February, 1894. Walker on Patents, § 70.

The next question is one of infringement. This is the important

question in this case and must be viewed in the light of the pleadings and evidence as determining exactly whether or not the defendant has infringed the complainant's patent. The complainant in its bill has alleged that the defendant corporation has made and sold within the Western district of Pennsylvania, and elsewhere, furnaces which are an infringement upon its patent. To this the defendant has replied in its answer the following defenses: That the defendant corporation has a license to manufacture and sell under the Garden patent; that the patent is inoperative, lacked novelty and utility, and was anticipated by other patents; that it was in use before the granting of complainant's patent and before his alleged discovery; that furnaces such as described by complainant were well known in the prior art; that the complainant has been guilty of laches, and therefore is not entitled to relief; and that defendant has not infringed complainant's patent. These must be disposed of in their order.

First, as to the license alleged by defendant corporation: In the defendant's answer it alleges an implied license in the Jogada Furnace Company to practice the invention, and that the defendant corporation, being the successor to the rights of the Jogada Furnace Company, has likewise the right to practice the invention, and that the complainant is thereby estopped from asserting this patent against it.

It appears from the evidence that James Garden, the patentee, was the president of the Jogada Furnace Company, and it was during his incumbency of that office that he claims to have discovered and subsequently applied for the invention in question. The defendants contend that by virtue of his relations to that company the Jogada Furnace Company was entitled to the right to use the invention, and that the defendant corporation, as successor to that company, would have the same right. The evidence in the case does not satisfy us that any such right existed in the Jogada Furnace Company. We find nothing in the evidence tending to show that Garden, as president of the company, owed any duty to the Jogada Furnace Company to give it the benefit of any discoveries that he might make. The relation of employer and employé did not exist between the Jogada Furnace Company and James Garden. Even if it did exist, that would not be sufficient unless there was evidence of a contract to assign. This was ruled in Pressed Steel Car Company v. Hansen (C. C.) 128 Fed. 444, where Judge Buffington said:

"The law applicable to this case falls within a narrow compass. The obligation of an employé to assign to an employer an invention made in the course of his employment does not arise from the existence of the relation of employé and employer alone, but there must be in addition a contract to assign."

The matter set up in the answer therefore, if proved, would not be a defect in complainant's title, nor be an estoppel in this case.

As to the inoperativeness of the patent: The patent having been duly granted, a presumption arises in its favor, and the burden would be upon the defendants to show that it was inoperative. The rights of the patentee for the purpose for which it was designed, together with the testimony showing that it successfully accomplished the purposes, in the absence of any evidence on the part of the defendants to show

that it was inoperative, clearly satisfies me that the defendants have not made out their case, and that this defense is not available.

As to novelty: A patent must be new and useful. I can find nothing in the evidence anywhere indicating that these improvements in the making of underfeed furnaces for the purposes set out in the Garden patent had ever been attempted, much less accomplished, prior to the discovery by this patentee. The evidence clearly indicates that previously to this invention there was trouble, and a serious one, found in operating the furnaces under the Jones patent, because of the tendency of the gases and smoke during combustion to be driven back into the ash pit and so into the engine room. The discovery that this could be overcome by covering the side grates was certainly altogether new.

As to the utility: As we have said, the evidence discloses that the defect in the Jones furnace, because of the backflow of gas, was very serious. It was found in using the furnace on the tug Ewing and on the tug Perfection, and wherever the furnace was used, that there was a decided tendency of the gases to flow back. The device was a simple one, but nevertheless was a useful one, because it was impossible to use the furnace unless provision was made to prevent this backflow. At the same time, the evidence discloses that the prevention of air from passing up through the grates and thereby cooling the furnace and interfering with the proper combustion was a serious trouble which this invention sought to prevent and which it did effectually prevent. The patent was clearly not lacking in utility.

As to anticipation: I have searched the patents set out in defendants' answer and offered in evidence, and we fail to find in any of them anything that would indicate that the defects in the Jones furnace or in any other underfeed furnace, so far as relates to the backflow of gas and the interference with combustion by the upflow of air, had been considered. None of these patents discloses any such defect, or attempt to remedy such defects.

As to prior use: The only evidence of prior use that we find in the evidence is an alleged use of partial dead-plates at San Francisco in 1891, and by Frazer & Chalmers in Chicago in 1893, and Swift & Co. later, the latter for the purpose of preventing the burning out of grate bars. The burden is upon the defendants to show this prior use. The only evidence of the use of dead-plates in 1891 is the testimony of Jones, and that not for the purpose set out in the patent. His testimony is found on page 28 of defendants' record:

"On the outer side of these air pipes or tuyères were placed two dead-plates extending the whole length of the furnace. The spaces between these dead-plates and the furnace walls were filled with grate bars. The furnace fronts were provided with fire doors over the grate bars and close-fitting doors in the ash pits under the grate bars. The retort or conduit being practically air tight, the ash-pit doors being a close, tight fit, there was no means of introducing air into this furnace only through the tuyère pipes above mentioned, when the stoker was in operation. The grate bars were further rendered practically air tight by the accumulation of slag, ashes, and other débris over them when the stoker was in operation."

It will be seen that this was neither the use of dead-plates covering entirely the grates nor the closing of the space by brick and cement, as was done by complainant. The rule as to the burden of proof of

prior use is that it must be shown beyond a reasonable doubt. The testimony of the witness as to the use at Portland in 1891 and at Chicago in 1893 does not satisfy us beyond a reasonable doubt, in fact, does not satisfy me at all, of the prior use of dead-plates for the purposes set forth in the Garden claims. It is very clear from the evidence that all that had been done there was that when holes were burned in the grate they were covered up to prevent the ashes from falling into the ash pit. There was nothing whatever to indicate that the trouble arising from the backflow of the gas, or the upflow of the air, was intended other than as a cover for the holes burned in the grates. The evidence is altogether unconvincing and unsatisfactory on this point.

As to the prior art: I do not find in the evidence, considering that the burden is upon the defendant to establish the use of such furnaces prior to the alleged discovery and invention of the patentee, sufficient to satisfy me that such furnaces were in actual use. There is no doubt that furnaces such as the Colton used dead-plates at the side of the conduit; but there is nothing to indicate that these were for the purpose for which dead-plates are placed in the furnaces of the Garden patent.

Regarding laches: This defense, I think, is not sustained by the evidence. The Garden patent was granted April 24, 1900. On September 18, 1902, the patent having been purchased by Dulles, Peobody & Peobody, Mr. Dulles, representing the American Stoker Company, the complainant, notified the Underfeed Stoker Company, the defendant, of their ownership of the patent, and afterwards notice was sent out by the attorneys for the complainant, notifying all the infringers, and in May, 1903, Mr. Arthur J. Baldwin communicated with the Underfeed Stoker Company, calling their attention to the infringement of the patent by that company. The bill was filed in July, 1906; it appearing that in the meantime the complainant was not in a position to prosecute its remedies against the infringers.

As to the infringement by defendants: This is the real defense set up by the defendants, and nearly all the testimony, covering many pages, was taken for this purpose.

The defendants' ground of defense as to noninfringement is that while they use a sealed furnace covering the entire space between the conduit and side walls, which effectually prevents the downflow of gas or the upflow of air, yet they claim that their purpose in so using it is not to prevent the downflow of gas, but for the purpose of using the space underneath the furnace as a reservoir into which air may be forced under pressure, thus cooling the dead-plates and also heating the air, so that when it is conducted through the tuyères into the reservoir the air will be in such a condition as to insure perfect combustion.

To properly consider this defense, it is necessary to clearly understand just what Garden accomplished and what the defendants have done. The Jones patent, No. 470,052, as may be seen, was for:

"1. A furnace provided with a fuel opening below the line of the fire, a supporting bottom for the fuel within the fire chamber sloping upward and backward from the supply-opening and having flaring sides which, with the bottom and the furnace wall, form a chamber or magazine for the fresh or green fuel

directly under the means for supplying air for promoting combustion, and a forcing means entering through the wall of the furnace whereby the fuel may be forced up into the fire through the opening at the lower end of the sloping bottom of the magazine, said sloping bottom forming a support for the fuel independent of the position of the feeding mechanism, substantially as described."

This furnace Garden took, using every element of it, but either covering the side grates with dead-plates or sealing up the space in the ash box from the air passages to the side walls. These air passages, as described by him in his drawings and specifications, consist of:

"Upon each side of the fuel conduit is an air chamber, i (better shown in Fig. 2), the two uniting at the front in a common passageway, j, which is connected in turn with a suitable fan or air compressor. Openings are formed in the top of the casing, into which are fitted a series of removable tuyères, k, leaving an outlet opening, i¹, the construction of which and the manner of securing the same in place are well known. By means of this device air may be forced into and thoroughly mixed with the fresh fuel at the point of combustion."

We have then a furnace as patented by Jones and improved by Garden by taking all the elements of the Jones patent and adding thereto the single and new element of making the furnace a sealed one in the manner described. His patent, being for a combination of old elements with a single new element, does not entitle him to claim equivalents to the same extent as if it were a pioneer or original patent. This the federal courts have many times decided. In Cimiotti Unhairing Company v. American Fur Refining Company, 198 U. S. 399, 25 Sup. Ct. 697, 49 L. Ed. 1100, Mr. Justice Day recognizes this principle, and speaking for the court, said:

"In determining the construction to be given to the claim in suit, which is alleged to be infringed, it is necessary to have in mind the nature of this patent, its character as a pioneer invention or otherwise, and the state of the art at the time when the invention was made. It is well settled that a greater degree of liberality and a wider range of equivalents are permitted where the patent is of a pioneer character than when the invention is simply an improvement, maybe the last and successful step, in the art theretofore partially developed by other inventors in the same field."

It was also said in Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122:

"We do not think it necessary to follow counsel for petitioner in his review of other cases which, he urges, sustain his contention. The right view is expressed in Miller v. Eagle Manufacturing Company, 151 U. S. 186, 207 [14 Sup. Ct. 310, 318 (38 L. Ed. 121)], as follows: 'The range of equivalents depends upon the extent and nature of the invention. If the invention is broad and primary in its character, the range of equivalents will be correspondingly broad, under the liberal construction which the courts give to such inventions.' And this was what was decided in Kokomo Fence Machine Case, supra [189 U. S. 8, 23 Sup. Ct. 521, 47 L. Ed. 689], and Computing Scale Co. v. Automatic Scale Co., 204 U. S. 609 [27 Sup. Ct. 307, 51 L. Ed. 645]. It is from the second of these cases, as we have seen, that the citation is made which, petitioner contends, the point of law upon which infringement depends is formulated; but it was said in that case: 'It is well settled that a greater degree of liberality and a wider range of equivalents are permitted where the patent is of a pioneer character than when the invention is simply an improvement, maybe the last and successful step, in the art theretofore partially developed by other inventors in the same field.' It is manifest, therefore, that it was not meant to decide that only pioneer patents are entitled to invoke the doctrine

of equivalents, but that it was decided that the range of equivalents depends upon and varies with the degree of invention. See Ives et al. v. Hamilton, Executor, 92 U. S. 426 [23 L. Ed. 494]; Hoyt v. Horne, 145 U. S. 302 [12 Sup. Ct. 922, 36 L. Ed. 713]; Deering v. Winona Harvester Works, 155 U. S. 286 [15 Sup. Ct. 118, 39 L. Ed. 153]; Walker on Patents, § 362; Robinson on Patents, § 258."

The covering of the grates for the purpose of preventing the downflow of gas was, as we have seen, only an improvement upon the Jones patent. It follows, then, that the Garden patent can only have, under the doctrine of "mechanical equivalents," such a range as its degree of invention entitles it to have. The improvement was narrow. Former patents, such as Colton's, No. 475,203, show dead-plates as in Fig. 2 of the drawing of that patent, and the Jones patent, No. 470,052, which in its specification states that:

"It will be understood that the side grates I are not depended upon for the supply of air to carry on combustion, and therefore the ashes and other débris may be allowed to pile over upon them to any reasonable depth."

The evidence also shows that Jones in 1891, at Portland, Or., and others at Frazer & Chalmers in 1893, partially covered the side grates to prevent their burning out entirely. While, therefore, Garden was the first to entirely cover the side grates so as to seal the furnace for the purpose of preventing the downflow of gas and the admission of air to the fire box, except through the tuyère openings, his invention was a narrow one, and the interpretation of his claim will be limited to such infringement as clearly appears to be the use of his invention to accomplish the result which he accomplished; but if the character of defendant's alleged infringing machine is radically different from that of Garden's, performing an additional function and one unknown to or unclaimed by, or not clearly a mechanical equivalent of, the Garden patent, then the defendant may be held not to have infringed.

The evidence conclusively shows that the furnace manufactured by the defendant is identical with the furnace covered by the Jones patent, No. 470,052; the Roe patent, No. 566,871; the Roe patent, No. 595,837; and the Daley patent, No. 644,664. We need only concern ourselves about the Daley patent, as the Jones patent was the pioneer patent and the Roe patents only improvements thereof as to the feeding device. The Daley patent is well described by Judge Brown in the case of Underfeed Stoker Company v. American Ship Windlass Co. (C. C.) 165 Fed. 65, 77, where he says:

: "Daley substituted for the open grates at the sides of the Jones furnace, closed plates; removed the tuyère boxes, or rather removed the bottoms of the tuyère boxes, so that the space beneath the grates of Jones, which served as an ash pit, was converted into an air chamber. The result of this was that all portions of the furnace subjected to heat were also subjected to the cooling of the air under pressure, thereby extracting the heat from the metal and thereby warming the air before it was forced through the tuyère openings to the fire."

The use of dead-plates, it will be seen, was for the purpose of sealing the furnace so that the whole space beneath the fire box, except that covered by the conduit, could be used as a reservoir into which the cool air might be forced for the purpose of performing the double function of cooling the grate bars and walls and at the same time raising

the temperature of the air so that it would not enter the fire box of the furnace in any way except through the tuyères and in a condition so as not to cool the furnace and retard combustion.

Let us now turn to the defendant's side and see what it did. The evidence shows that the furnace manufactured by defendant was, under the Jones patent, No. 470,052, the two Roe patents, Nos. 566,871 and 595,837, and the Daley patent, No. 644,664, and that the defendant's furnace is made by dividing the whole furnace into two primary parts, the fire box and the space below the fuel-bearing surface. No air passages are used, as in the Garden patent; but the entire space beneath the fuel-bearing surface not occupied by the fuel conduit is used as a reservoir into which air is forced for the purpose of cooling the dead-plates upon which the fuel rests and, by extracting the heat from the dead-plates and side walls, warm the air so that when it enters the fire chamber it will not reduce the temperature and retard combustion. We have then an entirely different furnace from the one described by Garden. It is true dead-plates are used, and that the result of their use is that the furnace becomes sealed and the gas does not flow down or the air escape upwards from the air box; but the new function which the defendant seeks to accomplish is by the use of the entire space underneath as a reservoir. I cannot avoid the conclusion that this was not an infringement of complainant's patent.

I am of opinion that the case of Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 568, 18 Sup. Ct. 707, 722 (42 L. Ed. 1136), is authority for this conclusion. The court said:

"But, even if it be conceded that the Boyden device corresponds with the letter of the Westinghouse claims, that does not settle conclusively the question of infringement. We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided. (Cases.) The converse is equally true. The patentee may bring the defendant within the letter of his claims; but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent. 'An infringement,' says Mr. Justice Grier in Burr v. Duryee, 1 Wall. 531, 572 [17 L. Ed. 650], 'involves substantial identity, whether that identity be described by the terms "same principle," same "modus operandi," or any other. * * *' The argument used to show infringement assumes that every combination of devices in a machine which is used to produce the same effect is necessarily an equivalent for any other combination used for the same purpose. This is a flagrant abuse of the term 'equivalent.'"

I am therefore of the opinion that the defendants have not infringed complainant's patent, and that the bill must be dismissed, with costs. Let a decree be drawn accordingly.