## AMERICAN STOKER CO. v. UNDERFEED STOKER CO. OF AMERICA et al.

(Circuit Court of Appeals, Third Circuit. June 12, 1911.)

### No. 1,474.

PATENTS (§ 328*)—INFRINGEMENT—UNDERFEED FURNACE.

The Garden patent, No. 648,251, for an underfeed furnace, is of narrow scope and is not infringed by the furnace of the Daley patent, No. 644,664, which, although it employs the single novel feature of the Garden patent, employs a different combination of elements to accomplish a different purpose.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

Suit in equity by the American Stoker Company against the Underfeed Stoker Company of America and David Hunter, Jr. Decree (182 Fed. 642) for defendants, and complainant appeals. Affirmed.

H. C. Lord, for appellant.

Frederick P. Fish, Walter H. Chamberlin, and J. L. Stackpole, for appellees.

Before BUFFINGTON and LANNING, Circuit Judges, and McPHERSON, District Judge.

LANNING, Circuit Judge. The complainant, American Stoker Company, owner of the James Garden patent, No. 648,251, for improvements in furnaces, charges the defendants with infringement of the patent. The defenses are the usual ones of invalidity of the patent and noninfringement. In its opinion the Circuit Court held the patent valid but not infringed. 182 Fed. 642. The decree, however, simply dismissed the bill without stating the reason therefor. It is not difficult to point out substantial differences between the furnace described in the Garden patent and the furnace made by the defendants.

Garden, in the specification of his patent, shows that he has on each side of his fuel conduit an elongated box or pipe for conveying compressed air to the combustion chamber into which the air is forced through tuyère openings in the box or pipe. As the air is thus forced into the combustion chamber, a pressure is produced sufficient to drive gases down through an ordinary grate into the furnace room. This creates a dangerous condition for workmen and also speedily destroys the grate. In order to overcome this evil, Garden says he dispenses

with the usual grate and substitutes therefor dead-plates of cast iron, removing the ashes through suitable doors in the front of the furnace upon a level with the dead-plates. He further says that:

"In lieu of the cast-metal dead-plates, the bottom of the furnace may be built up solidly with fire brick, except the air passages leading to the tuyères, thus leaving no opening corresponding to the usual ash pit beneath."

Thus is the primary object of the patent made clear, which, to quote the words of the patent, is "to so construct a furnace, in combination with an underfeed mechanical stoker, that the air may be supplied to the furnace at the point of combustion, while at the same time the gases formed may be prevented from returning or escaping otherwise than through the flue or stack designed therefor." It was not new to supply air at the point of combustion, but Garden claimed that it was new to prevent the downflow of noxious gases by substituting dead-plates for an open grate. The three claims of his patent are as follows:

"1. A sealed or grateless underfeed furnace in which is combined a fuel conduit adapted to feed the fuel from beneath, means for introducing the fuel thereto, air openings within or in operative proximity to said conduit, means for forcing air into the furnace through said openings, laterally-projecting sealed or air-tight ledges over which the fuel may spread and be consumed when forced upwardly through the conduit, and means for preventing the admission of air except through said air openings within or adjacent to the conduit, whereby air may be introduced under pressure, a backflow of gases prevented, and combustion insured, substantially as described.

"2. The combination with a furnace of the class described, of an underfeed conduit, means for introducing fuel thereto, means for introducing a blast of air to openings adjacent to the conduit and dead-plates forming laterally-projecting air-tight ledges for the reception and support of the fuel, substantially as set forth.

"3. The combination with a furnace of an underfeed conduit, means for introducing fuel thereto, means for introducing a blast of air to openings adjacent to the conduit; the bottom of said furnace being entirely closed adjacent to the sides of said conduit."

The fuel conduit, the means for introducing the fuel thereto, the air openings adjacent to the conduit, and the means for forcing air into the furnace through the openings, mentioned in these claims, were all old elements in a furnace. By the sealed or air-tight ledges of the first claim, the dead-plates of the second claim, and the closing of the bottom of the furnace adjacent to the sides of the conduit mentioned in the third claim, the downflow of gases is prevented.

The defendants' furnace is a very different structure, and it possesses features not found in Garden's furnace. It has the fuel conduit, the means for introducing the fuel thereto, the air openings adjacent to the conduit, and the means for forcing air into the furnace through the openings, just as Garden and others have them. It also has the air-tight ledges of Garden's first claim, the dead-plates of his second claim, and the bottom combustion chamber adjacent to the sides of the fuel conduit is closed as in Garden's third claim. But Garden's claims are combination claims each having means for supplying air to the furnace at the point of combustion and designed also to prevent the downflow of gases into the furnace room. The defendants' structure

possesses no elongated box or pipe for conveying compressed air to the combustion chamber. The bottom of their furnace cannot be built up solidly with fire brick. In the defendants' furnace, the dead-plates form both a bottom for the combustion chamber and a roof for the compressed air chamber. All the space beneath the dead-plates is filled with compressed air, which is forced into the combustion chamber through the openings along the sides of the fuel conduit. As the air is forced into the air chamber, it circulates there and extracts heat from the dead-plates, thereby preserving them, and is itself heated before it is forced into the combustion chamber, thereby aiding combustion

The prior state of the art is such that the Garden patent, if valid at all, must be a narrow one. In the Evan W. Jones patent, No. 470,052, dated March 1, 1892—more than two years before the application for the Garden patent was filed—it was expressly stated that the grate was not depended on for the supply of air to carry on combustion, and that the ashes and other débris might be allowed to pile up·on the grate to any reasonable depth. A layer of ashes and débris over a grate sufficient to prevent the passage of air upwards through the grate into the combustion chamber would probably retard, if not prevent, the passage of the gases downwards through the grate from the combustion chamber. It is shown, however, that there was at times in the Jones furnace a very objectionable downflow of gases. To overcome that defect, plates were placed over the portions of the grate adjoining the sides of the fuel conduit. This seems to have been done in Chicago as early as the spring of 1893. Indeed, there is testimony that it was done in Portland, Or., in 1891. In any event, assuming the Garden patent to be valid, its claims cannot be broadened by construction beyond what is reasonably necessary to accomplish the stated primary object of the patent. Garden never conceived the object of the defendants' combination. That effect is not even remotely hinted at in the Garden patent or suggested by it. It is set forth in the Fred A. Daley patent, No. 644,664, dated March 6, 1900, under which it is alleged the defendants' furnace is constructed. In that patent Daley declares that theretofore air had been conveyed through the tuyère openings from tuyère boxes. In furnaces of that character, says he, it had been proposed to provide means for closing the ash pit to prevent the backflow of gases and for other purposes; said means usually being in the form of iron dead-plates located along the sides of the fuel retort or conduit. These dead-plates, he further says, were soon destroyed because of the excessive heat to which they were subjected.

"My invention," says he in his specification, "has for its object, first, the provision of improved means for conveying air under pressure through the tuyère openings, whereby the expensive tuyère boxes heretofore employed for this purpose may be dispensed with, and, second, in so constructing furnaces employing dead-plates that the dead-plates may be cooled by the incoming air under pressure before the air is directed upon the burning fuel, so that the life of the dead-plates may be greatly increased; and it is in connection with furnaces employing dead-plates that my invention has its greatest utility. * * * These tuyère openings, instead of communicating with tuyère boxes through which air is conveyed under pressure, as was

heretofore the case, communicate directly with the inclosed space beneath the fire box, to which inclosed space air is supplied under pressure, which by coming in contact with the dividing walls or parts between the fire box and the space beneath the same is heated somewhat before it is passed through the tuyère openings, whereby the combustion is promoted to a greater extent than where the cold air is forced through tuyère boxes whose walls were not subjected to the heat from the fire box above. * * * In a furnace constructed in accordance with my invention, the undersides of the dead-plates are constantly exposed to the incoming air, which counteracts the heat from above. I thus avoid the necessity of so frequent renewal of the dead-plates, and by dispensing with the tuyère boxes as heretofore used there is secured a saving in complication and expense. The air, being admitted first to the space beneath the fire box, becomes heated before it is driven into the fire box. This results in a better and more complete combustion than is obtained when the air is introduced to the retort at a lower temperature."

The claims of Garden's patent, it must be remembered, are combination claims. Each of them has for its object the very limited one set forth in the specification of the patent. The defendants do not employ the same combination of elements, and they secure a result not dreamed of by Garden. To quote a passage from the brief for the appellees, "the essence of Daley's invention lies in these features—dispensing with the Jones tuyère pipes, and the use of the ash pit as an air chamber through which the air is supplied to the fire." For Garden's purpose, the ash pit could be solidly built up with fire brick, for he makes no use of it. While the dead-plates are an element in the Garden combination and also in the combination of the defendants, the combinations are, by reason of other varying elements, widely different, and they have totally different purposes and secure totally different results.

But the complainant contends that the defendants, by their answer, have admitted infringement. We do not think the answer should be so construed. In the fifteenth paragraph infringement is expressly denied. The fourteenth paragraph, in which the complainant insists the admission of infringement is to be found, is inartistically drawn. The former part of it contains statements from which, if they be read without reference to the latter part, one would be obliged to infer admission of infringement; but, when the paragraph is read as a whole, it seems that the former part is intended to lay the ground for the charge of laches in the latter part. At all events, it is clear that the defendants did not intend to make an unqualified admission of infringement, and the record of the case furnishes abundant proof that the complainant has not understood that such an admission was intended to be made, and that it has been in no way misled or embarrassed in the prosecution of its case by the badly drawn paragraph.

Nor do we think the history of the Daley patent, while it was pending in the Patent Office, discloses any infirmity in that patent or requires it to be construed as a mere improvement of the Garden patent. It is true that Daley, in the specification of his patent, expressly disclaims the invention described in claim 3 of the Garden patent; but that does not mean that Daley may not use a combination of elements different from the combination described in claim 3 of Garden. The basic conceptions of Garden and Daley differ so materially that it is

impossible to sustain Garden's claim to the Daley combination. We are quite in accord with what the learned judge of the Circuit Court has said on this subject, and we think, with him, that the complainant has failed to show infringement. This conclusion renders it unnecessary for us to express any opinion on the question of the validity of the Garden patent.

The decree of the Circuit Court will be affirmed, with costs.