DOWSE v. FEDERAL RUBBER CO. et al.

(District Court, N. D. Illinois, E. D. December 6, 1918.)

No. 973.

1. PATENTS ☾☞93—OWNERSHIP—INVENTIONS OF EMPLOYÉ.
　　Whether a patent for an invention made by an employé belongs to him or the employer depends upon his position. If the work for which he is paid is done under direction of others, any invention he makes outside of such work is his own; but if he contracts to devote his time and services to making improvements in articles made by the employer, a patent for any such improvement belongs in equity to the employer.

2. PATENTS ☾☞93—OWNERSHIP—INVENTION OF EMPLOYÉS.
　　A patent for an essential and valuable improvement in rubber tires for automobiles, developed by employés of a rubber company as the result of many and various experiments, and for which patent was issued to the president and general manager, who had sole charge of the company's business and was the second largest stockholder, held, under the facts shown, to be the property of the company.

3. PATENTS ☾☞328—VALIDITY—OWNERSHIP—RUBBER TIRE.
　　The Dowse patent, No. 1,174,238, for a method of reinforcing automobile tires, held valid, and to be in equity the property of the Federal Rubber Company in whose plant the invention was developed.

In Equity. Suit by Byron C. Dowse against the Federal Rubber Company and others. Decree for defendants.

Albert H. Graves and Cyril A. Soans, both of Chicago, Ill., and Louis Quarles and Charles B. Quarles, both of Milwaukee, Wis., for plaintiff.

George T. Buckingham and Edward Rector, both of Chicago, Ill., Chester H. Braselton, of Dayton, Ohio, and George T. May, Jr., and Harry W. Lindsey, Jr., both of Chicago, Ill., for defendants.

SANBORN, District Judge. There are three defendants, the Federal Rubber Manufacturing Company, a Wisconsin corporation, formerly located at Cudahy, Wis., the Federal Rubber Company, a Massachusetts corporation, which succeeded to the manufacturing company, and the Federal Rubber Company of Illinois, the selling agent of both the other corporations successively. The latter was the only original defendant; the others being later brought in.

The suit involves both the validity and ownership of patent No. 1,174,238, of March 7, 1916, issued to B. C. Dowse, upon a method of reinforcing automobile tires known as the "double cable base." The patent was applied for in Dowse's name, while he was employed by the manufacturing company, and issued to him after he left it. The main question is whether the patent equitably belongs to the corporation, or whether it has merely a shop right. Plaintiff relies on Hapgood v. Hewitt, 119 U. S. 226, 7 Sup. Ct. 193, 30 L. Ed. 369, on the question of ownership, and also contends that the shop right has lapsed because it was incapable of transfer from the manufacturing company to the rubber company. An assignment from the manufacturing company to the rubber company was made May 12, 1916, purporting to assign all its property, expressly mentioning patents, patent rights, and shop rights. At this date the Dowse patent had been issued to him. Dowse sold his stock and left the manufacturing company December 8, 1915.

The patent relates to the means for retaining the tire upon the wheel rim; also for prevention of tire destruction. It is unnecessary to consider it in detail, because the chief question in the case is patent ownership, and the equitable claim of the rubber company to an assignment. It may be said, however, that it covers the wire cable imbedded in the base of the tire which holds the tire firmly on the rim. There is a presumption of validity. Cantrell v. Wallick, 117 U. S. 689, 6 Sup. Ct. 970, 29 L. Ed. 1017. The tire has been quite a successful one. The patent has great utility. It should be sustained in both its claims.

[1] The all-important question is Dowse's relation to the tire-manufacturing business. If he was only a hired man, taking orders as to his work from another officer or employé, the invention belonged to him, leaving only an implied license or shop right to the corporation, and this right was only personal to it, incapable of being assigned. The Supreme Court thus states the rule:

"An employé, performing all the duties assigned to him in his department of service, may exercise his inventive faculties in any direction he chooses, with the assurance that whatever invention he may thus conceive and perfect is his individual property." "That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer. Whatever rights as an individual he may have had in and to his inventive powers, and that which they are able to accomplish, he has sold in advance to his employer." Solomons v. U. S., 137 U. S. 342, 11 Sup. Ct. 88, 34 L. Ed. 667.

It thus becomes necessary to examine Dowse's relation to the corporation. He did not expressly contract as a part of his duties to design new tires; but if he did so agree in substance, and was more than a mere employé, having the main responsibility to make the business successful, then he should be compelled to assign the patent. In this connection Judge Buffington's statement of the governing rule is pertinent:

"The obligation of an employé to assign to an employer an invention made in the course of his employment does not arise from the existence of the relation of employé and employer alone, but there must be in addition a contract to assign. Thus, in Dalzell v. Dueber Mfg. Co., 149 U. S. 320, 13 Sup. Ct. 888, 37 L. Ed. 749, it is said: 'A manufacturing corporation, which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so employed, in the absence of an express agreement to that effect. Hapgood v. Hewitt, 119 U. S. 226, 7 Sup. Ct. 193, 30 L. Ed. 369.'" Pressed Steel Car Co. v. Hansen (C. C.) 128 Fed. 444.

[2] So the real test is whether Dowse occupied such a relation to the corporation that he was its alter ego, in such a capacity that it is only consistent with good faith that he should recognize its ownership of the patent issued to him. Can he, without breach of his obligation toward his late employer, insist upon retaining and enforcing against it the patent he took out? Worthington Pumping Engine Co. v. Moore, 19 Times Law Rep. 84.

The facts from which defendants argue that Dowse was not a mere employé, but the principal and directing officer of the corporation, are as follows:

B. C. Dowse has been engaged for many years past in manufacturing rubber tires. Just prior to 1911 he was president of the G. & J. Tire Company engaged in such manufacture. Before that he had had extensive experience with other tire manufacturers.

J. N. Willys, of Toledo, Ohio, is, and was in 1911, president of the Willys-Overland Company, engaged in automobile manufacturing and selling. For a number of years his company had been purchasing tires from concerns with which Dowse was identified. He had known Dowse for over 20 years. He had the fullest confidence in Dowse as an individual and in his knowledge of the tire-manufacturing business. Willys, personally, had had no experience in tire manufacturing in 1911. Early in 1911 these two men decided to become jointly interested in a rubber tire manufacturing enterprise. In March they arrived at a general understanding. An investment of about $1,000,000 was contemplated. A plant would be purchased. Willys was to advance the principal amount of money. Dowse was to be president and general manager of the company to be formed, and to operate it; the running of the business was to be left to him. Willys was to furnish 80 per cent. of the money, and Dowse 20 per cent.; Willys to "carry" Dowse for the latter's share.

The plan was put in prompt execution. Dowse negotiated the purchase of a plant of the Federal Rubber Company, a Wisconsin corporation, at Cudahy, Wis. The purchase price, plus incidental expenses,

amounted to about $125,000. Title to the property was taken by James E. Kepperley, as trustee. Kepperley was attorney for Willys. Thereupon, in April, 1911, a new Wisconsin corporation, namely, the Federal Rubber Manufacturing Company, was organized, and the property was turned over to it. The capital stock of this corporation was $1,000,000 (all common). The property was conveyed to the new company in payment of $250,000, par value, of stock. Ultimately all of the capital stock was disposed of at par; over 90 per cent. of it being taken up on behalf of Willys and Dowse, and the remainder going to a few stockholders, some of whom like Dowse, were "carried" by Willys.

In so far as the financial relation of Dowse to the company and to Willys is concerned, the following is substantially correct: Dowse put up in cash $11,050. When the plant, purchased for approximately $125,000, was turned over to the manufacturing company for $250,000 value of stock, Dowse received $50,000, par value, of that stock as a bonus or promotion stock, and received his 20 per cent. of the remainder, after a few shares—his 20 per cent. of the small amount allotted to Kepperley—had been deducted. At the end of the business relationship, Dowse, on his investment of $11,050 cash, owned outright of the common stock $72,200, and was being "carried" by Mr. Willys for $164,000. On each issuance of stock for which Mr. Willys supplied the entire amount of cash, 20 per cent. was issued to Dowse, who gave his note for the purchase amount to Willys and made the purchased stock collateral to the note.

The original $1,000,000 of common stock was all issued and paid for in the manner above stated by the last of June, 1912. It then became necessary to have more capital, and an additional issue of $1,000,000 preferred stock was authorized to be sold at par. Ultimately Willys bought somewhat more than 95 per cent. of this.

On August 31, 1911, Messrs. Dowse and Willys made a written agreement showing their basic relation, which contained, among other things, the following language:

"Whereas, party of the second part is a competent rubber manufacturer, with experience extending over a period of 15 years, and has been induced to take hold of and manage the said Federal Rubber Manufacturing Company upon the promise and undertaking that party of the first part would furnish the major part of the finances necessary to organize and operate said corporation, and party of the first part has been induced to agree to furnish a large percentage of finances and to enter into said enterprise with the distinct understanding that party of the second part would affiliate himself and remain with said enterprise and give his entire time and attention thereto. * * * "

Willys testified (and it is not denied by Dowse) that at the inception of their relation Dowse agreed that he would take full and entire charge of the contemplated enterprise and would "give his entire time, thought, and attention wholly and solely to this particular business."

When the manufacturing company acquired the Cudahy plant, Dowse selected his own organization, chiefly of men who had been identified with him, took charge of the business of the new corporation, and thereafter was president and general manager. Initially his

salary was $10,000 per year, and in December, 1912, it was raised to $12,000 per year.

As president and general manager of this corporation Dowse had sole, full, exclusive, and complete control of its operation and management. Willys relied on him absolutely. Thus Kepperley says:

"I had no means of knowing as to the actual handling of that plant there because, as I have repeated two or three times, I knew nothing about rubber manufacturing. I knew nothing about the business, and relied entirely upon Mr. Dowse, as those were Mr. Willys' instructions to me—that Mr. Dowse was in charge of that plant and was the one upon whom we were relying. I was largely there in a legal capacity."

And Willys says:

"I was to advance the principal amount of money and he was to run the business. I was to leave the running of the business practically to him. He was to be general manager and president of the company, and operate it. I was very busy engaged in my own business, and didn't have any time or any knowledge about the tire business, and of course I appreciated that he·did, so naturally I did just the same as I have in lots of other enterprises—got hold of some man who had the knowledge, put some money in with him, and went ahead."

On December 10, 1915, Dowse sold his stock to Willys for $90,000, yielding him a net profit of approximately $60,000, resigned as president and general manager, and retired from the corporation. There was some dissatisfaction with Dowse's management, but it is unnecessary to notice it, or pass upon the merits of Dowse's claim that he was forced to resign.

The business of making automobile tires, in 1911, was in a rapidly developing state, and many and successive improvements in construction details were being made by all manufacturers in that product. The former company which had operated the Cudahy plant, at the time it sold out, did not make, and for a year before the sale had not made, automobile tires, and therefore the manufacturing company proceeded to develop a tire-manufacturing business "from the ground up." Several different kinds and types of tires were manufactured at first, and, on being tried, changes were successively made in them from time to time, and various improvements resulting from experiment and experience succeeded each other, as a part of the evolution of the new company's tire product. This enterprise, undertaken by Dowse and Willys, with the practical details left wholly to the former, was inherently one of development of a satisfactory product, and on Dowse, and the operatives selected by Dowse, rested the practical duty of that development.

During the course of this development, Dowse and his organization began the manufacture of tires of the "straight wall" or "straight side" type. This was a type that then was fast coming into the popularity that now makes it the standard construction. Such a type of tire was a necessity to meet the then existing demands of the trade. The construction adopted included in the "bead filler" of the tire base a single "cable" of five turns of piano wire. This is called in the record the "single cable base" tire.

After these straight wall tires had been put out and widely sold and distributed, it developed that many of them were unsatisfactory, because of their tendency to blow off the rim and also to pinch the inner tube. Complaints of this began coming in through the sales department in the latter part of 1912, and by the early part of 1913 the situation had become acute. Dowse, F. Haskell Smith, factory manager, his assistant, Frank, Githens, sales manager, Thompson, in charge of the laboratory, and all the other important men in the construction and sales organization, were greatly concerned over this situation, and there was an active and earnest effort on the part of every one to locate the trouble, and to find a remedy for it. The matter stood as a manufacturing impediment in the course of the development essential to the enterprise, and naturally every one concerned in the production sought to find the channel of escape from the difficulty. Meanwhile the manufacture of this straight wall type of "single cable base" tires was almost suspended. It ran down from 4,075 tires in the month of January, 1913, to 1,397 in the month of April, 1913, and to 1,173 in the month of May, 1913, both of which last months are at the height of the tire-manufacturing season. Indeed, the situation was so acute that Dowse, by his own account, was unable to sleep at night because of the worry thereby occasioned.

Some time in the month of May, 1913, there was evolved and constructed in the plant, as the outcome of the many and various experiments, tests, and conferences, a tire construction which proved to be a solution of this manufacturing problem, and this construction is known as the "double cable base." This differed from the former construction only in that there were two cables, instead of one, placed in the bead filler in the tire base. This "double cable base" construction was put in regular production May 14, 1913, and from thenceforth became the standard tire product of this plant, and so remained during the entire business career of the manufacturing company, and afterward, in the same plant, of its successor, the rubber company.

It appears from Willys' testimony that in January, 1913, he went to Europe, returning about April 30th, and that he remained in America until about May 21st, when he again left for Europe. Shortly before his departure he visited the plant at Cudahy, and then it was, according to his recollection, that he learned of this double cable base development. It was represented to him as something on which the business could be greatly extended, as a great improvement, one that had overcome their trouble, and so, as Willys puts it, " * * * when they came along in May and had this thing, and I had a big investment there, I naturally put in a lot of money to back up that investment." It appears from the record that on May 22d Willys put up $247,000 for more of the preferred stock.

Dowse himself states in effect that he extolled the merits of this improvement to Willys as "the best thing ever produced for holding tires on the rim," though he does not know whether it was at this precise time.

Willys returned from Europe in September, 1913, and found the tires to be on the market, in fact, in use on the Willys-Overland cars,

and during the next month he purchased and paid for approximately $125,000 of preferred stock, which exhausted the issue.

In the autumn of 1913, after this new bead construction had been practically tested and found to produce excellent results, the company embarked upon an advertising campaign. It adopted the name "Federal Double Cable Base" as a trade-mark for tires having the improved base construction, and stamped that name upon the tires. It also proceeded in a large way to advertise the tires of this construction under the name "Federal Double Cable Base." This advertising had for its central feature pictures of the two-cable construction, and the nub of the whole advertising campaign was that this particular construction was an exclusive feature of the Federal Rubber Manufacturing Company. Backing up this advertising, effort was made to protect the trade-mark, and to make truly exclusive by patent the feature of construction so heavily advertised.

The advertising designs, which are in evidence, are shown to have been evolved and planned by the advertising staff of the company, and to have all received the approval of Dowse, and to have been used with his specific knowledge. This advertising, in circulars, newspapers, and magazines, was extensive, expensive, and widespread; hundreds of thousands of dollars of the corporate funds being spent on it while Dowse remained president of the company. It held out, and was intended to hold out, to the dealers and to the public that this particular construction, identified under the name "Federal Double Cable Base," was the exclusive feature of the manufacturing company, to be found only in its tires.

The facts relating to the patent application are that Ward, the secretary, first took up the trade-mark matter in a letter to Munn & Co. on October 14, 1913. This letter stated that it was desired to protect the company by "letters patent or copyright" on the name. The New York attorneys replied that a trade-mark registration on this name was probably impossible to obtain, because it was descriptive, and after some correspondence the subject was dropped, pursuant to Ward's letter of October 28th. On January 5, 1914, Ward, for the corporation, again wrote the New York attorneys, this time as to the possibility of obtaining patent on "our new tire construction." With this letter there was inclosed an advertising circular of the corporation showing the construction. Further correspondence ensued, and on March 10, 1914, Dowse in person called on the New York attorneys and confirmed the instructions to proceed with the patent application and effort at trade-mark registration. Dowse took the matter up as president of, and as representing, the Federal Rubber Manufacturing Company.

In due course, and after correspondence, the patent and trade-mark applications, respectively, which had thus been taken up as a company matter, and as part of a single transaction, by Dowse as president of the company, with the attorneys, were prepared and filed; the patent application, which under the law had to be in the name of an individual, being signed by Mr. Dowse personally, and the trade-mark application, which had to be in the name of the company, being signed

by him as president. The patent application was filed in the Patent Office, June 16, 1914, and the trade-mark application was filed June 26, 1914. For the fees and charges for both of these filings, as well as the attorneys' services in connection therewith in the amount of $105, bills were rendered by the attorney to the corporation, and were paid by its check dated June 13, 1914.

In advertisements of the company of the "double cable base" tires, beginning with the April issue of "Motor," 1914, just after Dowse's visit to the patent attorneys in March, the words "Patent Applied for" are printed in conjunction with the illustration of the "double cable base" feature, and in the June issue of this magazine (standing as a typical advertisement of the company) the same "Patent Applied for" legend appears in the same conjunction with the representation of this special construction, again represented by the text to be an "exclusive" feature.

The testimony taken at the trial proves that the charges of the New York attorneys thus paid by the company were never charged against Dowse, or paid for by him, but remain an item of expense on the corporation's books to this day. Dowse and Ward testified generally to the effect that in December, 1915, after Dowse resigned, Dowse said that these patent expenditures which the company had paid were to be charged to him personally on the company books, but it appears that this was not done.

It appears that Mr. Dowse knew of these advertisements. There were also conversations with him to the effect that, if another company undertook to use the double cable base, they would have to pay royalty to the manufacturing company. Nor did the plaintiff ever claim ownership of the patent application until after his resignation from the offices of president and general manager.

It thus appears that plaintiff was not a mere employé, under the direction of a superior officer. During the whole period he was president and general manager, and one of the directors. The others were Githens and Kepperley, the former coming with Mr. Dowse from the G. & J. Company, and the latter representing the Willys interests. The plaintiff, therefore, was practically the corporation, taking orders from no one. His executive authority and control were practically exclusive. He could be dismissed only by the board of directors, and then only by consent of Mr. Githens, who came there with him, until Willys should exercise his majority stock control by changing the board. It is true that Willys had the ultimate power of corporate control, and for the time being this authority was vested solely in Dowse.

While by the law of Wisconsin he was not strictly a trustee for the corporation, only an agent, yet by reason of his relation to Willys, and the great importance of the new cable base to the corporate business success, his position was that of a quasi trustee, such as to make it clear that the patent was taken out by him for the corporation. Had the invention affected only a detail or unimportant part of the corporate business, it is probable that plaintiff would be regarded as its owner, both legal and equitable, as in American Stoker Co. v. Underfeed Stoker Co. (C. C.) 182 Fed. 642; Id., 188 Fed. 314, 110 C. C. A.

292. Here the patent involved the very life of the corporation. It was developed by the whole corporate force as something absolutely necessary, under the supervision of the president, who was straining every nerve to make good. It entered vitally into the very business life of the company, and was finally issued while plaintiff was still drawing his salary, although no longer in control. Under the circumstances it would be grossly inequitable for plaintiff to retain title, and the rule of Hapgood v. Hewitt and the cases following its rule does not apply. In the ordinary case a shop right to the corporation will satisfy all equitable demands; but here the new company's title to that right would be quite doubtful. A case closely in point is Worthington Pumping Machine Co. v. Moore, supra.

[3] There should be a decree sustaining the patent, and that the federal company is the equitable owner, entitled to have an assignment, with costs against plaintiff.