### 347

| The New Era Manufacturing Company vs. Earl F. Stanton | Eq No. 4468 |
|---|---|

RESCRIPT

May 27, 1919

BARROWS, J. Heard on bill, answer, replication and oral testimony on issues of fact.

Complainant, under the name of Era Narrow Fabric Company was incorporated to manufacture braid in April, 1915. 600 shares were issued. Respondent held 598; his father and another relative one each. One pur-

pose described in the Articles of Association was "to acquire and take over from Earl F. Stanton, a covenant with respect to the acquisition of certain technical machinery made to him by Robert L. Stanton" (father of Earl F. Stanton). This refers to the proposed sale to the company of the business of manufacturing Cam Race braiders. This proposal was later altered so that the corporation in June 1916 purported to buy the business of R. L. Stanton and one Judkins, which business was the manufacturing of braid under a contract with the United Lace and Braid Manufacturing Company (corporate records p. 50-55). It was voted to carry on this business and an agreement relating thereto appears on pages 56 to 60 of the records. The company then issued preferred stock without voting powers to the wives of R. L. Stanton and Judkins in exchange for said business. The business headquarters of the new corporation were always where R. L. Stanton purported to be doing business.

Upon organization respondent's shares were issued to him in payment for labor, expenses and assignment of contract with Judkins and R. L. Stanton relating to Cam Race braiders. Respondent was elected president and R. L. Stanton treasurer, at salaries respectively of $12 and $10 per week. The corporation had no money and did no business prior to May 1916. Respondent went to work for the Travellers' Insurance Company in November 1915. He continued to be a director in the corporation but worked for the insurance company until the end of October 1916. when he returned to his father's place of business. By whom he was then employed is in dispute. In the spring of 1916, while employed by the insurance company, respondent conceived an idea for a braiding machine. He had no funds and told

his father about his idea. He and his father paid small sums for models, &c., and the machine was sufficiently reduced to practice by December 8, 1916, to warrant application for a patent. This was made by respondent through attorney Horatio E. Bellows, Esq. There is no evidence that either respondent or his father considered at this time that the patent was to be the property of the corporation. The machine was called the New Era braider. This patent was granted in April 1918.

On May 15, 1916, at the annual meeting of the corporation, R. L. Stanton, as treasurer, had reported (records p. 41) that no business had been carried on by the corporation during the preceding year but some expenses and obligations had been incurred; that no cash had been paid to the company and no other stock issued. The company at that time being indebted to the respondent and R. L. Stanton for their salaries as president and treasurer respectively, it was voted to issue $500 of preferred stock to the former and $1000 of preferred stock to the latter, they to release all claims against the company as of May 31, 1916. (Records p. 43). This was done. (Record p. 49). R. L. Stanton and respondent signed a statement that all known liabilities of the company had been paid as of May 31, 1916. (Record, p. 50). Judkins in May 1916 was elected president and so continued until November 15, 1916, when he retired from the corporation and respondent was again elected president, which office he continued to hold until July 2, 1918.

About the 15th of November 1916, respondent returned to the place his father was working at 159 Aborn Street. In his answer respondent states that he worked for the corporation from November 1916 to July 1918. He received a regular salary

of $25 per week from November 1st. At the trial R. L. Stanton testified that respondent worked for him personally and not for the corporation from November 1916 to March 1, 1917. Respondent testified that after November 1916 he was foreman of his father's braiding business. He denies receipt of salary from the corporation, although the records show that on November 15, 1916, the directors voted a salary of $25 per week to the respondent as president from November 1st, and $35 per week to R. L. Stanton as treasurer and general manager, effective from July 1, 1916 (Records p. 63). At any rate, the braiding business was being conducted at the place in question. Respondent worked at this braiding business and upon his patent, spending most of his time on the patent. Bills were incurred and money spent in development of respondent's patent. These bills and wages were charged to the corporation but paid by R. L. Stanton's personal check. The corporation, prior to March 1, 1917, had not, while R. L. Stanton was treasurer, any bank account in its own name. Checks were drawn on an account standing in the name of R. L. Stanton. Prior to March 1, 1917, R. L. Stanton and respondent both say that the corporation had no funds. R. L. Stanton, however, testified that the Era Company assumed his business debts in 1916 and that repayment of his advances in connection with the patent he expected to come from his interest in the corporation. Respondent testified that the corporation owed his father for such advances.

We find that the money advanced by R. L. Stanton was on behalf of the corporation and not the payment of his own personal bills in his own personal business with which the corporation had no concern. We are fortified in this finding by certain established facts and because of the records relating to the transfer of R. L. Stanton's business to the corporation (Records p. 51).

On the stand R. L. Stanton and respondent evidently believed it essential to prove that at the time the patent was applied for (December 8, 1916) respondent did not work for the corporation. It is significant, however, that the $25 weekly wage payment to respondent starts November 1, 1916, and exactly corresponds with the vote of the directors (Records p. 63); that respondent at a corporation meeting in May 1917 reported that the company had continued to manufacture braid until March 1, 1917, when it sold out to Lull. (Records p. 67); that R. L. Stanton held out to the public that the corporation, not he as an individual, was doing business; that the company advertised the New Era braided and received many orders therefor; that in June 1916, when the wives of R. L. Stanton and Judkins got the preferred stock, the company's name was put on the door and has remained there continuously; that the telephone was put in and listed in the name of the corporation; that the machinery at the plant was taxed at R. L. Stanton's request to the corporation as owner and taxes paid by R. L. Stanton; that castings to develop the patent were ordered in the name of the corporation; that the electricity was furnished and billed to the corporation; that goods were bought in the name of the corporation from the Providence Paper Company; that fire insurance, formerly on the property in the personal name of R. L. Stanton, was cancelled, the rebate paid to him, and a new policy taken out in the name of the corporatoin at R. L. Stanton's order; that Patent Attorney Bellows was told to charge the expenses connected with procuring the patent to the Era Manufacturing Company and did so.

**350**

On March 1, 1917, the braiding business was sold to the Lull Manufacturing .Company for $5300 and a note for $3200. The transfer was made by a bill of sale from the corporation, signed by R. L. Stanton as treasurer. The money was deposited in the name of the corporation. This sale was ratified May 21, 1917, at the annual meeting of stockholders. (Records, p. 67). Some of the money from the sale of the business was at once paid to R. L. Stanton. His explanation of how the corporation came to make this transfer at a time when he personally owned the business is foggy. The documentary evidence compels him to admit that the sale was made by the corporation, but he claims that the property sold up to the minute of sale, was his own private property. It is not clear to him just when the corporation got title to this property or how. He finally evolves a momentary mental transfer by him to the corporation just prior to the bill of sale given to the Lull Manufacturing Company by the corporation through him as treasurer. The evidence is overwhelming that the corporation was doing business as early as July 1, 1916, and being financed by R. L. Stanton. It was both making braid and furnishing funds to help develop respondent's patent. No question was raised about ownership or use of the patent as between respondent and the corporation. The latter was purely a family affair.

At the annual corporation meeting May 21, 1917, respondent as president reported that "the company had acquired during the last year certain inventions relating to the manufacture of braiding machines; had applied for patents thereon and had entered upon the manufacture and sale of such braiders under the name of New Era braiders and at present is not engaged in the manufacture of braid".

**350**

(Records p. 68).

He also recommends on April 16, 1918, a change in the charter to make the object of the company the manufacture of braiding machines instead of braid, because the former was the real nature of the company's business at that time. (Records p. 79).

Respondent testified that when he reported that the company had "acquired" inventions relating to braiding machines and applied for patents thereon, he referred to this particular patent but meant that the company had an ORAL LICENSE from him dealing with himself as president and his father as treasurer. This license was to use the patent without charge as long as respondent continued with the company under arrangements reasonably satisfactory to him. The existence of such an agreement was testified to by respondent and R. L. Stanton and by no one else. They

**351**

say that the agreement was definitely made between them individually and as officers of the corporation. The latter portion of respondent's report relative to application by the corporation for patents, he now states was false. He does not state that such report was made intentionally as a false statement. Respondent's bargaining with himself as president and has father as treasurer in December 1916, without corporate record thereof which he claimed at the same time to be working for his father in an individual business of the same nature, shows the identity of respondent and R. L. Stanton with the corporation in their own minds. Respondent says neither the nature of his continued connection with the corporation nor the question of royalties was ever discussed but both were to be on terms satisfactory to him. Respondent admitted that after the trobule arose he offered to permit the use of his patent on the condition that his father be employed by the

**350, 351**

corporation. Both R. L. Stanton and respondent testified confusedly about the time when this oral license was given. Respondent's answer says it was made on June 15, 1916 before the patent was applied for. In his testimony he says the answer is wrong and places it at December 8, 1916 or January 1, 1917. He says his father made the royalty proposition. "It was in substance that the company t a k e over the manufacture of machines under my patent right; that as long as I remained actually engaged with the company it could make machines without royalty; if I quit, the company should have the first opportunity to manufacture them for a royalty." R. L. Stanton is not sure when the agreement was made, but thinks it was about the time his son stated. He says it was actually made and, any way, was always understood; that it was talked over many times at home and at the factory. Both admitted that this agreement never was communicated to anyone except as it may have been talked over in the presence of Mrs. Stanton or Mr. Wrightington, who had become clerk of the corporation and who was a relative of the Stantons. No corporate record of this agreement was ever made, a matter of some significance in view of the rather careful and full corporate records. Prior to June 1918, when the trouble arose, no discussion was ever had about it in corporate meetings. The Court believes that the report of May 21, 1917, was honestly made with no distinction in respondent's mind between himself and his father on the one hand and the corporation on the other. To ' him they were identical. The distinction arose after trouble in the corporation on June 29, 1918. (Records p. 103). Then arose the fiction of an oral license. In addition, the very obvious embarrassment of R. L. Stanton and respondent on the stand when explaining about it, forces us to find that there never was any such oral license agreement.

### 352

The only property of value in connection with the corporation was the patent right. It was evident that Humes and Lawson, when financial aid was sought early in 1918, bought stock in the company, each buying $5000 in the belief, induced by word and act of both Stantons, that this patent was an asset of the company. We believe that at that time R. L. Stanton and respondent considered the company had unqualified rights to manufacture braiders under the patent. We do not believe that they deliberately misled Humes and Lawson. The corporation, as organized and conducted, until December 1917 was purely family affair. R. L. Stanton said, "We were the whole thing." "When Humes came into the corporation we expected to go on with the manufacture of braiders. Lawson's money was used in marketing machines." "Everything I did was in the hope of building up the braider." This view explains the report of respondent to the corporation, above quoted, on May 21, 1917, to the effect that the company had acquired two inventions and applied for patents. It explains respondent's and R. L. Stanton's statement to Humes in February 1918 and their permitting Lawson to believe that the company possessed or would possess the patent. It makes intelligible R. L. Stanton's paying corporate bills with his personal checks. It explains why the books produced by the treasurer Humes, as found by him in the office of the company, are claimed by R. L. Stanton to be both a record of personal and corporation transactions.

After December 1, 1917, it is admitted that all expenses of developing the patent, such as purchase of tools, materials, castings and drawings, were paid by the corporation. R. L. Stanton told Humes before he became a stock-

holder in February 1918 that the corporation owned the patent. Respondent told him after he became a stockholder that the company owned the patent. On April 16, 1918, Mr. Lawson bought his stock. The company made and delivered 25 or 30 machines. Humes became treasurer on May 20, 1918. He says the corporation spent $10,000 on development work on this patent. Both Lawson and Humes visited Attorney Bellows, who was in charge of getting the patent. There is some dispute about what took place, the former stating that Bellows said the company owned the patent and Bellows denying this. Bellows' attention was centered on the merits of the patent rather than technical ownership. It is not difficult to see how the misunderstanding arose between perfectly reliable and honest people when the Stantons and the corporation had always been talked of as identical. Bellows did, however, at the request of the respondent, permit Lawson and Humes to take the papers in the case for examination. An examination of these records showed that the patent had never been

**353**

assigned to the company. On the front of the folder was a blank transfer for an assignment.

In June trouble arose; respondent's salary was discontinued as president, whereupon he made the company an offer to permit it to finish orders on hand under his letters patent without compensation, if the company accepted such offer at once. No action was taken on this proposition.

Upon the above facts complainant seeks to have respondent declared a trustee of said patent rights for the benefit of the corporation and asks to have respondent execute an assignment of the patent, relying either upon an implied agreement to transfer such right or an estoppel in pais. It is admitted that no express agree-

ment to transfer has been shown. The Court also fails to find any implied agreement.

Certain principles seems to be established in cases relating to ownership of patents:

(A) The mere fact of employment at the time a patent is secured does not give the employer title to the patent. Without an agreement to transfer the patent an invention by an employee, even perfected during the employer's time, does not belong to the latter.

Hapgood vs. Hewitt, 119 U. S. 226.

Pressed Steel Car Co. vs. Hansen, 137 Fed. 403.

American Circular Loom Co. vs. Wilson, 198 Mass. 182

Same case 126 Am. St. Rep. 409.

(B) By express agreement either title or a shop right (license) may be secured to the employer.

McAleer vs. U. S., 150 U. S. 424.

(C) If an employee is hired to devise or perfect an instrument to accomplish a specific result, then the employee's invention, while so engaged, may either belong equitably to the employer or give the latter a shop right to use the patent without specific agreement.

Dowse vs. Federal Rubber Co., 254 Fed. 308.

Solomons vs. U. S., 137 U. S. 342.

**354**

(D) Where an employee hired to work in a particular business conceives an invention and uses property of the employer in developing it and allows the employer to use the invention, without compensation, an implied license to do so is given the employer.

Gill vs. U. S., 160 U. S. 426

Blauvelt vs. International Cord & Insulation Co., 80 Fed. Rep. 906.

Walker on Patents, 4th ed., Sec. 313 a.

Still more so when the making and

selling of the invention is the sole business of the corporation.

Mueller vs. Mueller, 95 Fed. Rep. 155.

The application of the above principles makes it clear that complainant is not here entitled to the transfer of the patent. Respondent does not hold it in trust for complainant. The Dowse case is clearly distinguishable. There the patent was produced by the joint work of several minds and Dowse was merely the conduit through whom the patent passed for the corporation because the patent could be issued only to an individual. Everyone connected with the enterprise knew that Dowse was not nor claimed to be the originator of the idea. In taking out the patent he was acting only for the corporation.

Complainant claims, however, that if the specific relief sought is denied, it is yet entitled to ask the Court to give it a shop right under the prayer for general relief. This proposition is sound.

Eustis Mfg. Co. vs. Eustis, 27 Atl. 439 N. J.

Is complainant entitled to a shop right? Such rights are based upon estoppel. We believe the acts of respondent were such as would estop him to deny a shop right to the corporation if he had been an employee working for a stranger. Respondent, however, contends that no estoppel can arise because the corporation in respondent's person as president was fully cognizant of the fact that the patent was the personal property of respondent; that all corporate expenditures were made with this knowledge; that such knowledge being chargeable to the corporation before Humes and Lawson became stockholders never ceased to exist in the corporation. The argument is technically sound but the answer is that knowledge acquired by an officer or agent of a corporation while acting for himself and

adversely to the corporation is not imputable to the corporation. When a corporation officer acts for himself in a transaction with the corporation, he is a stranger to the corporatoin, dealing as if he had no official relation with it.

10 Cyc. 1062.

Platt vs. Birmingham Axle Co. 41 Conn. 255.

Compare converse of above

Mihilis Mfg Co. vs. Camp, 49 Wis. 130.

Same case, 5 N. W. 1.

The propriety and equity of such a rule is clear in the present case. This patent right is the "soul of the corporation." Without it there is nothing of value. Innocent stockholders relying on corporate rights in the patent were induced to purchase stock. The corporation spent the money derived from such stock sales to develop the patent of respondent. It would work injustice to hold that the corporation could not enforce its rights because at some prior time it was chargeable with knowledge possessed by respondent, an officer with an adversary interest, never communnicated to anyone.

We therefore conclude that complainant corporation is entitled to a shop right or license to manufacture said New Era braider. Inasmuch as there has been no opportunity for counsel to discuss the limits of such rights, we will hear them on this question at the time of entry of decree.

For complainant: Gardner, Pirce & Thornley.

For respondent: Wilson, Gardner & Churchill.