HENRY & WRIGHT MANUFACTURING COMPANY, Plaintiff, *v.* FRANK M. ROGERS, Defendant.

Supreme Court, New York County, February 7, 1930.

*Webb, Patterson & Hadley*, for the plaintiff.

*Goldmark, Bennitt & Colin*, for the defendant.

MITCHELL, J.   The plaintiff, a corporation engaged in the manufacture of dieing and drilling machines, seeks through this action a decree of this court adjudging it to be the owner of a German patent on the so-called Viktor drilling machine issued to the defendant while in its employ, requiring the defendant to assign same to plaintiff and to account to it for all funds, money or other property derived therefrom.   The defendant became associated with the plaintiff in August, 1921.   He was employed as general manager.   From August, 1921, until October, 1926, he was also assistant treasurer and a director.   As general manager, he had general charge of the business in all of its relations.   His duties were of an executive, administrative and supervisory character.

There can be no question about the nature of his duties, since they were clearly defined by the following resolution adopted by the stockholders in August, 1921: " A general manager of the business, whose duty shall be to look after all matter pertaining to the management of this business.   To see that each and every department is brought up to its highest efficiency, with full power to transact any and all business pertaining to the affairs of this corporation.   To make and sign all contracts with employees, selling agencies, salesmen, etc., and all such other contracts which may be necessary for conducting the affairs of this corporation from time to time, to look after every detail pertaining to this business through its several employees.   To confer and advise with the chairman of the executive committee and the president of this corporation and with the full executive committee on all important matters, whenever it is practical to do so, and whenever the said executive committee or any of its members are readily accessible for such conference.   All employees shall be subject to the direction of the general manager and shall be responsible to him.   The general manager in turn shall be subject to the acts of the board of directors and the executive committee, making such reports as he may be called upon to render at any time, offering such suggestions to the board of directors and

to the executive committee as in his judgment will be for the betterment of the business." The nature of defendant's employment is thus clearly defined. He was not hired to exercise his inventive faculties in the discovery of patentable ideas for plaintiff. Indeed, his previous experience, confined as it was to the sphere of business management and administration, of the general character of which plaintiff through its officers was aware, afforded no basis for believing that he had inventive skill. His prior experience would appear to have been such as to equip him for general business management, precisely the kind of service which his employment with plaintiff called for.

The defendant filed his application for the United States patent on the so-called Viktor drilling machine on August 18, 1923, and the patent was issued to defendant on February 24, 1925. The German patent on the machine was applied for by the defendant on December 16, 1924, and the grant was effective as of the date of the application. The issuance of these patents to defendant is *prima facie* proof that he was the original inventor. (*United Shirt & Collar Co.* v. *Beattie*, [C. C. A.] 149 Fed. 736, 741; *American Brake Shoe & Foundry Co.* v. *Hoadley Brake Shoe Co.*, [D. C.] 222 id. 327.) No one else claimed credit for the invention on the trial. This case does not fall within the line of cases represented by *Standard Parts Co.* v. *Peck* (264 U. S. 52); *Magnetic Mfg. Co.* v. *Dings Magnetic Separator Co.*, ([C. C. A.] 16 F. [2d] 739); *Air Reduction Co.* v. *Walker* (118 Misc. 827), and *Annin* v. *Wren* (44 Hun, 352). In these cases it was shown that a contract or agreement existed between an employer and his employee, having for its purpose the devising of a specific thing. They are illustrative of the principle that, if one is employed to devise or perfect an instrument or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of the employer. (*Solomons* v. *United States*, 137 U. S. 342, 346.)

The defendant's employment in the instant case was most general in character. The devising or perfecting of drilling machines for use in connection with plaintiff's business was not embraced in the execution of his official duties or the service for which he had engaged himself to the plaintiff. The distinction is pointed out in the court's opinion in *Goodyear Tire & Rubber Co.* v. *Miller* ([C. C. A.] 22 F. [2d] 353, 356) as follows: " It is not a case of one who, being employed for a general service, makes an invention on the side, outside of his line of duty. Defendant was employed exclusively in a department,

the function of which was to improve old and discover new processes and devices. Such was the service for which he was paid, and while so employed he was, in the regular course of his employment, assigned to the specific task of developing a device to perform the very function for which the invention in suit is adapted."

The plaintiff contends that a duty on the part of the defendant to assign the patent in question will be implied from the circumstances disclosed by the evidence. Plaintiff places much reliance upon the position which the defendant occupied with the corporation and upon the fact that the other directors, officers and stockholders, except two, were in other cities engaged in their own affairs. It contends that the evidence establishes that the Viktor drill invention, even if primarily that of the defendant, was contributed to by persons employed by the corporation; that the corporation bore much of the expenses relating thereto, and ultimately all of them by its payment of $3,000 to the defendant in connection with the assignment of his United States patent; that the Viktor drill was in line with its needs and policy; that it had been advertised by the corporation, under the defendant's direction, as an improved machine developed by the company's engineers. The defendant, on the other hand, points out that he personally paid the bills of the patent attorney and also those of Kavle, the consulting engineer, totaling $1,116.05; that, while the contract with Ludwig Loewe & Co. of Berlin, covering the Wright dieing machine, was made with plaintiff corporation, the contract covering the Viktor drill entered into with the Berlin concern was made with defendant personally, and described him as the inventor and licensor; that Mr. Langworthy, one of plaintiff's directors, assisted the defendant in going over the drafts of these contracts in the fall of 1924; that the royalty payments received from Germany under the license agreement made with the defendant personally were collected by him, not covertly or separately, but were openly credited to him on the corporation's books; that two days after the meeting of October 6, 1926, at which defendant's resignation as general manager and assistant treasurer was accepted, a statement of the defendant's account with the corporation was rendered to him, which was subsequently paid; that this was confirmed in January, 1927, by the rendition to the defendant of a full set of his entire accounts with the corporation in detail.

The defendant denies that there was any reference made to an assignment of the German patent at the meeting of the board of directors on February 5, 1926. The defendant's testimony is that he then stated that the Viktor drill patents belonged to him. Plaintiff's witness, Langworthy, corroborates the defendant's testimony

in this respect. Defendant testified that he at that time called attention to the fact that the corporation had a shop right to manufacture the machine, from which he was collecting no royalties, and stated that, " so far as the patent itself is concerned, that is in my name and my property." The defendant further testified in substance that he agreed to assign the United States patent for a consideration which would cover practically his " expenses for getting out those patents," with a view to promoting the sale of the company's plant to a third party. It appears from the testimony of plaintiff's witness, Hoover, that at that meeting there was a resolution voted to give Tichenor & Co., of New York, an option to buy the plant and property of the company. It appears that on February 25, 1926, the defendant made out a bill to the corporation for $3,000, covering the assignment of the United States patent, which amount was credited to his personal account with the corporation. This patent the defendant shortly thereafter assigned to the corporation.

I do not think that the assignment of the United States patent by the defendant to plaintiff corporation should be construed as an admission upon the defendant's part that he was under a duty to assign it. In the first place, the defendant's testimony, corroborated by Langworthy, is that he stated at the directors' meeting on February 5, 1926, that the Viktor drill patents belonged to him personally. In the second place, the defendant gives a reasonable explanation for his willingness to make the assignment for the sum named by him at that time. This explanation is based upon the undisputed fact that the directors were considering at that meeting a proposed sale of the assets of the corporation to a third party. As a matter of fact, a resolution was passed at that meeting giving to that party an option to purchase the assets of the corporation. Obviously, if the corporation owned the patent, its position in the negotiation of a sale would be improved. The defendant owned one-twelfth of the corporation's stock, and hence had a financial interest in the proposed sale. It is quite evident, too, that the discussion of this subject gave rise to the question of the assignment of the patent.

The plaintiff lays particular emphasis upon two cases which it regards as controlling in the case at bar. They are *Dowse* v. *Federal Rubber Co.* ([D. C.] 254 Fed. 308) and *Worthington Pumping Engine Co.* v. *Moore* (19 Times Law Rep. 84). In the latter case the plaintiff corporation's claim was based, as appears from the opinion, " on the ground that the patents were merely for forms of construction of pumps which were embodied in drawings furnished by them to the defendant as their agent, and that the defendant had no

right, having regard to the obligations arising from his position and duties, to make use of *confidential information* acquired by him in the course of his employment for the purpose of taking out a patent unless for the benefit of his employers." At the outset of its opinion the court defines the legal point involved as follows: " The action also raised an important question of law as to the right of a servant to take out a patent for an invention made by him during his contract of service as the result of materials and information supplied to him by his employers." " In the result I think it is proved," observed the court, " that everything in both patents disclaimed, as also the cross over ports and the independent passage in patent 4,302, were represented in drawings belonging to the plaintiff corporation prior to instructions being given for taking out the patents."

The plaintiff corporation in the instant case makes no claim that the defendant evolved the invention from drawings or other " confidential information " furnished by the corporation to the defendant. On the contrary, it appears that the first rough sketch of the invention shown to anybody was one made by the defendant himself, and represented a conception which he alone worked out, that he showed this sketch to Sherman, the plaintiff's engineer, on March 1, 1923, and that the latter signed his name on it as a witness.

In *Dowse* v. *Federal Rubber Co. (supra)* the court rested its decision upon two main elements of the case, Dowse's relation to Willys and the great importance of the invention to the corporation. Dowse and Willys had embarked upon the enterprise together, and were the principal organizers of the corporation. The business was that of rubber tire manufacturing. Willys had had no experience therein, but he invested a very large sum of money in the enterprise. He relied entirely upon Dowse and his extensive knowledge of the business. The latter invested comparatively little money, but was given full and entire charge of the business. The invention was " developed by the whole corporate force." It " involved the very life of the corporation." It arose out of a crisis in its affairs, due to the fact that the first tire manufactured and sold by the corporation, the " straight wall " type, proved a failure. The manufacture of this tire was almost suspended. The corporation faced ruin. Accordingly, to quote the language of the court, " there was an active and earnest effort on the part of every one to locate the trouble, and to find a remedy for it," and " every one concerned in the production sought to find the channel of escape from the difficulty." At length the remedy was found in the invention there in suit, the so-called " double cable base " construction. It was " evolved and constructed in the plant, as the outcome of the

many and various experiments, tests and conferences," and became the standard tire product of the plant. After Willys learned of it he invested an additional $247,000 in the corporation in order to back up his already large investment. Hundreds of thousands of dollars were spent out of the corporate funds in advertising it as the exclusive feature of the corporation. The matter of getting a patent therefor was taken up with the patent attorneys; first by Ward, the corporation's secretary, and then by Dowse, as president of, and as representing, the corporation. All of the expenses incident thereto, including the charges of the patent attorney, were paid by the corporation. They were never charged against Dowse or paid for by him. In addition, Dowse never claimed ownership of the patent application until after his resignation as president and general manager.

Plaintiff corporation, in the case at bar, falls far short of presenting such a clear and convincing case in its favor. In the first place, there is no equivalent of the relationship of trust and confidence which the proof showed existed between Dowse and Willys from the inception of what was a new enterprise, and which drew from the latter an investment which appears to have been upward of $1,500,000. Neither the plaintiff corporation here nor any of its stockholders parted with anything by reason of their relationship with the defendant, with the exception of the salary received by him and the $3,000 for which the corporation secured an assignment of his United States patent. On the other hand, it is clear that the corporation has profited much by its use of the defendant's invention. Nor did the invention arise out of a crisis in the business of the corporation. It manufactured dieing machines as well as drilling machines. While the development of an improved drilling machine was needed to meet competition, the situation of the corporation from the business standpoint at the time the invention was made does not compare with the acute distress of the company in the *Dowse* case. Nor was the invention "developed by the whole corporate force." On the contrary, the defendant himself was the original inventor. Nor did the corporation pay the expenses incident to the patent application. The evidence shows that the defendant in the case at bar paid the charges of the patent attorney, and likewise bills submitted by Kavle, a consulting engineer not identified with the corporation, totaling $1,116.05. Though the $3,000 later paid to the defendant by the corporation for the assignment of the United States patent covered his expenses, the fact is that these were paid by the defendant in the first instance, which is cogent evidence that he claimed ownership of the patent application from the beginning.

It may be noted, too, that the contract with Ludwig, Loewe & Co., the German firm, for the manufacture and sale of the new drilling machine in Germany, was made with the defendant personally, and that the defendant asserted ownership of the patents at the directors' meeting on February 5, 1926. In the *Dowse* case the patentee never claimed ownership of the patent application until after he had resigned as president and general manager. In that case, too, the court made this significant observation: " In the ordinary case a shop right to the corporation will satisfy all equitable demands; but here the new company's title to that right would be quite doubtful." The plaintiff corporation's title to that right is not doubtful here. It is not a successor corporation. It is the one which employed the defendant. The plaintiff, under the circumstances presented, did not become entitled to more than a shop right. (*Hapgood* v. *Hewitt*, 119 U. S. 226, 233; *Gill* v. *United States*, 160 id. 426; 1 Walker Patents [6th ed.], § 363, and cases cited in connection therewith; *Solomons* v. *United States*, 137 U. S. 342.) However, there is no necessity of entering into a discussion of the plaintiff corporation's title to a shop right, since such a right has at all times been freely conceded to it by the defendant. In addition, the plaintiff has title to the United States patent issued to the defendant by virtue of the assignment.

I see no reason under the principles laid down by the authorities why a court of equity should feel itself constrained to require the defendant to further invest the plaintiff corporation with the fruits of his inventive genius. While the plaintiff corporation was entitled to the loyal service of the defendant as an officer thereof, his services as such did not embrace his inventive faculties. Upon these the nature of his work made no call. He owed no duty to the corporation to exercise his inventive skill in its behalf, and, when he did so, he undertook a task to which he was not summoned by any contract with the plaintiff or by the nature of his employment. He developed his thought into a patentable creation, but, while so engaged, he was acting under no obligation arising out of the orbit of his service as general manager of the corporation.

For the reasons stated, I conclude that the defendant is entitled to judgment dismissing the complaint upon the merits, with costs.