FREDERICK BEDELL, Respondent, *v.* DICTOGRAPH PRODUCTS COMPANY, INC., Appellant.

Third Department, May 12, 1937.

*Straus & Osserman [Stanley Osserman, Walter H. Free* and *Theodore F. Tonkonogy* of counsel], for the appellant.

*Newman & Newman [Charles H. Newman* of counsel], for the respondent.

BLISS, J.   This is an appeal by the defendant from a judgment of the Supreme Court entered in the Tompkins county clerk's office on August 28, 1936, upon the report of Hon. CHARLES C. VAN KIRK, official referee, in favor of the plaintiff and against the defendant for $97,080.31 damages and $3,482.83 costs, amounting in all to $100,563.14.

The respondent was a professor of physics at Cornell University, and the appellant a manufacturer of hearing aid devices selling a hearing aid under the trade name "Acousticon." On May 18, 1932, they entered into a written agreement. This contract recited that Prof. Bedell had invented a bone induction hearing aid for the deaf and had made application to the Patent Office for a patent covering the invention, and that the appellant desired to obtain the exclusive right to manufacture and market the apparatus thus invented. Prof. Bedell then agreed that upon the granting of the patent he would assign it to appellant, and also assign to the appellant any further patents in the hearing aid field granted on inventions made by him during his lifetime. He also agreed that appellant might use his name in connection with the advertising and sale of the apparatus subject to certain restrictions. The company agreed to make certain graduated monthly payments to him for limited periods and also to pay him "the following royalties, in cases where patents are pending or granted and for so long as the patent continues:

"(a) For each electrical tube amplification instrument and/or each hearing aid employing bone conduction sold the sum of five dollars," and a percentage of the cost of manufacture of each hearing aid by a type other than those included under (a) upon which a patent was procured. The professor also agreed to be available for consultation and the manufacturer to bear all legal expense connected with the patent application then pending.

The respondent has brought suit for the alleged failure of the appellant to make both the monthly and royalty payments. The appellant brought suit for fraud and misrepresentation in the negotiations preceding the contract for which it asked money damages. It also asked to have the contract rescinded because of lack of consideration in that the alleged invention was not in truth an invention and not patentable and alleged that the provision as to the payment of royalties was so indefinite as to render the contract void and unenforcible. Each party made appropriate answers in these actions, which were then consolidated and heard and determined by the late Hon. CHARLES C. VAN KIRK, official referee. He found in respondent's favor on all of the issues and directed judgment for the respondent for the unpaid stipulated monthly payments amounting to $6,666.56 and $82,290 for royalties under the quoted provision of the contract, together with interest and costs. The appellant urges before us that the court below lacked jurisdiction to determine the question as to the payment of royalties, because it involves the issue of infringement of the Bedell patent, that the bone conduction hearing aid device sold by it did not come within the royalty provision of the agreement because of non-use by appellant, and that the patent is invalid and the contract must, therefore, fail for lack of consideration.

Many further facts are essential to this discussion. In an advertisement distributed by the appellant in connection with the sale of the bone conduction hearing aid manufactured and sold by it after it made the contract with Prof. Bedell, and which it called the " New Bone Conduction Acousticon," are related some of the facts as to Prof. Bedell and his development of his bone conduction hearing instrument. It describes the principles of bone conduction with relation to the transmission of sound vibrations through the bones of the head to the auditory nerves and says that when the outer and inner ear are obstructed or impaired the bone conduction acousticon transmits sound vibrations to the inner ear through the bones of the head rather than through the usual path of the ear. It says that Dr. Bedell, professor of physics at Cornell University, began a series of independent experiments in an attempt to produce an instrument which would successfully transmit sound to the deafened through bone conduction and that he was particularly well equipped to undertake this task, being recognized as a world authority on alternating currents — the electrical impulse upon which practically all hearing aids depend — and that he is the author of several standard works on electrical engineering and the inventor of a number of far-reaching principles in telephony, telegraphy and aeronautics; that after months of study and experi-

ment Dr. Bedell finally developed the deaf speaker, a bone conduction hearing instrument operated by a transmitter, amplifier and receiver; that this instrument was demonstrated before the National Academy of Sciences in Washington, D. C., April 26, 1932 and its performance was acclaimed by the assembled scientists and also that Dr. Bedell established the superiority of bone conduction for many cases in several institutions for the deaf. The advertisement then goes on to say that while the trail blazer of this great advance in hearing aids, Dr. Bedell's deaf speaker was not practical for ordinary personal use because it was not portable, that the Dictograph Products Co., Inc., maker of the Acousticon — the pioneer telephonic hearing aid — believed that the new bone conduction method could be successfully incorporated in a portable instrument, and so impressed by Dr. Bedell's researches that they persuaded him to become their consulting physicist in its development and that " thus resulted the New Amplified Acousticon, with perfected bone conduction." It also said that the appellant decided at the outset that this new bone conduction instrument (obviously referring to the instrument developed by Dr. Bedell) no matter how desirable, would not be marketed under the name " Acousticon " until its application to a portable instrument had been brought up to the high standards established by Dr. Bedell and that for more than three years the Acousticon laboratories continued to reject all compromises — to persist in painstakingly perfecting this new bone conduction hearing aid — to bring it to the thirty-one year standard of Acousticon, and that the new bone conduction Acousticon had been perfected as all hearing aids bearing the name " Acousticon " had always been perfected. This was the appellant's own story given to the public through its advertisement of the development by Dr. Bedell of his deaf speaker employing bone conduction and its adaptation by the appellant to the " New Bone Conduction Acousticon."

Shortly after the demonstration by Dr. Bedell before the National Academy of Sciences on April 26, 1932, of his deaf speaker, a bone conduction hearing instrument, the appellant opened negotiations with him which culminated in the above-mentioned written contract. This agreement reserved to the appellant the privilege of amending the form thereof and a few days after its execution it notified Dr. Bedell that there was no need to rewrite the contract. Also before the contract was signed the appellant's chief engineer examined and tested Dr. Bedell's apparatus.

After the making of the contract the appellant took Dr. Bedell's apparatus to its laboratories and proceeded to work out a bone conduction hearing aid which would be in marketable form. All

the interested parties conceded at the time of the negotiations that, as developed by Dr. Bedell, the device was not suitable for merchandising and it was not until September, 1933, that the final product was ready for market. In the meantime the appellant paid to Dr. Bedell the regular installments agreed upon through the month of July, 1933, and the parties had co-operated in the development of the new instrument. Dr. Bedell went to the appellant's factory and also was consulted in other ways. The appellant stated at that time in a letter that he was " working rather closely with us on special development work." Also, the appellant took over the prosecution of Dr. Bedell's application for a patent and paid the expenses thereof until a patent was finally granted, which included the allowance of some, but not all of the claims made by Dr. Bedell in his original application.

On September 15, 1933, the appellant notified Dr. Bedell it had been advised by its patent attorney that because only one claim of those contained in his application for a patent had been allowed and on account.of the many prior patents of bone audition apparatus it was very doubtful whether any further claims would be allowed on the application filed by him and that if the hearing device were constructed as illustrated in his application it would be an infringement of another patent. The appellant further said that it, therefore, felt the terms of the contract of May 18, 1932, had not been carried out by the respondent and that it could not manufacture an instrument of his specifications. It also stated that Dr. Bedell was indebted to it for the money advanced on account of the representations made to induce it to enter into the contract. Dr. Bedell replied he was not prepared to accept the company's patent attorney's findings or advice as to his invention, that he stood ready to fulfill his agreement and requested payment of the amounts then due. A few weeks later, after a conference between appellant's president and Dr. Bedell at Washington, D. C., in which the former stated he withdrew his letter of September 15, 1933, repudiating the contract, the appellant paid up the arrears of monthly installments. Thereafter it continued to make the regular payments to Prof. Bedell for another eight months. In the meantime it had placed upon the market its new hearing aid device involving bone conduction which it called the " Acousticon " and referred to in its advertisements as the " New Bone Conduction Acousticon " and said that these bone receivers were now made in several types, each with a different pitch, which for the first time made it possible to practically cover every individual requirement and that it felt this was " one of the outstanding developments in the industry — second only to Bone Conduction

which was developed in the cooperation with our Consulting Physicist, the well-known Dr. Frederick Bedell of Cornell University."

After resumption of friendly relations between the parties as a result of the meeting in Washington between Dr. Bedell and the appellant's president, the appellant proceeded with the sale of its newly-developed hearing aid device employing bone conduction and published and distributed the advertising circulars containing the statements above referred to which Dr. Bedell had approved before it was distributed by the appellant. With these advertising circulars the appellant distributed order blanks for the bone conduction acousticon.

On January 8, 1935, a patent was granted to Dr. Bedell " for an alleged new and useful improvement in apparatus for bone audition " and Dr. Bedell proceeded at once to execute and deliver to the appellant an assignment of this patent. The appellant received the assignment, retained it for several months and then returned it to Dr. Bedell. The appellant was then in default on payment of the monthly installments and also had paid no royalties on the new bone conduction acousticon.

The official referee held that the contract was valid and that there was no failure of consideration and no fraud or misrepresentation by the respondent in the negotiations; that the respondent's invention of an apparatus for bone audition was an improvement over the prior art and was useful and that the patent was valid. He also held that the bone conduction acousticon marketed and sold by the appellant was a substantial equivalent of Dr. Bedell's invention and that he was entitled to recover the unpaid installments then due on the contract with interest and also the five-dollar royalty for each such acousticon sold by the appellant from the 18th day of May, 1932, to the 30th day of November, 1935. A finding as to the amount of these sales was also made and judgment was entered in accordance with this decision. On the trial the appellant withdrew its charge of fraud in the negotiations which preceded the contract.

The contract on its face is definite and complete. It clearly expressed the agreement between the parties and shows ample consideration moving from each party to the other.

Appellant urges that that part of the judgment below which is based on the five-dollar royalty provision must be reversed as the court below was without jurisdiction to determine the issue. In support of this contention it states that the respondent's claim is that its hearing aid device is an infringement upon his patent. We find no infringement issue in this case. No such issue was

raised by the pleadings or passed upon by the court below. No findings or conclusions with relation to infringement were made. The respondent himself makes no such claim. The appellant refers to the testimony of one of the plaintiff's expert witnesses in which such witness stated, in answer as to whether in his opinion the bone conduction acousticon of the Dictograph Products Company was covered by Professor Bedell's patent, that the equipment was an infringement of the Bedell patent. Thereafter there was some testimony on the part of the appellant to the effect that there was no infringement. Respondent claims that the appellant is now the owner of the patent which was issued to him. He is, therefore, in no position and does not claim any infringement and there was no issue of infringement before the court below.

The appellant concedes that it marketed and sold a hearing aid employing bone conduction, but says that there the similarity with the device covered by the plaintiff's patent ends. To entitle the respondent to the royalty under the contract the hearing aid employing bone conduction must bear a relation to the device covered by the patent and must be included in cases where patents are pending or granted." This is the language of the contract and as we interpret it the parties meant that the royalty was payable upon the patented invention or its substantial equivalent.

" The substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape." ( *Union Paper Bag Machine Co.* v. *Murphy*, 97 U. S. 120.)

Since this is an action on contract the fact that there incidentally arises the question as to whether defendant's new bone acousticon is the substantial equivalent of the invention of the plaintiff does not deprive our State court of jurisdiction.

" He was entitled to the royalties secured by his contract and nothing more. And the only question raised by the bill of complaint and the answer of Albright and Cahoone was simply this: What is the sum due the appellee from Albright and Cahoone for his royalties under his contract? In ascertaining this amount it, of course, became necessary to inquire what goods were manufactured by the appellants under the patents of the appellee. In prosecuting this inquiry an incidental question might arise, namely, What goods were manufactured by the appellants under other patents of which they were the owners or licensees? But this incidental and collateral inquiry does not change the nature of the litigation. The fact that Albright and Cahoone had licenses to use other

patents under which they were manufacturing goods, does not give them the right to litigate their cause in the United States courts because certain goods which they asserted were made under the other patents, the appellee asserted were really made under his. The suit, notwithstanding the collateral inquiry, still remains a suit on the contract to recover royalties, and not a suit upon the letters patent. It arises solely upon the contract, and not upon the patent laws of the United States.

" In fact, it does not appear that there is any dispute whatever between the parties in reference to the construction of the patents of the appellee. The controversy between them, as stated by the appellants themselves, is whether certain goods manufactured by them embody the invention covered by the appellee's patents. This does not necessarily involve a construction of the patents. Both parties may agree as to what the patented invention is, and yet disagree on the question whether the invention is employed in the manufacture of certain specified goods. The controversy between the parties in this case is clearly of the latter kind.

" The case cannot, therefore, be said to be one which grows out of the legislation of Congress. Neither party asserts any right, privilege, claim, protection or defence founded, in whole or in part, on any law of the United States.

" We are, therefore, of opinion that, even if we go outside the pleadings and look into the testimony, the case is not one arising under the laws of the United States and, consequently, that the courts of the United States had no jurisdiction to entertain it." (*Albright* v. *Teas*, 106 U. S. 613.)

Furthermore, there has been no effort on the part of the defendant to remove the cause from the State to the Federal courts pursuant to sections 71 and 72 of title 28 of the United States Code, and the defendant by appearing, answering and proceeding with the trial has lost the right of removal if such right existed. (*Paolicelli* v. *Samuels*, 278 Fed. 629.)

The referee found that the bone conduction Acousticon marketed and sold by the defendant was a substantial equivalent of plaintiff's invention and that the defendant used the plaintiff's name in connection with the advertising and sale of the same. This conclusion is irresistible from the advertisements published and distributed by the appellant in connection with the sale of its bone conduction acousticon and also that it had included therein the principles which were present in Dr. Bedell's deaf speaker and which were embodied in the apparatus patented by him and that Dr. Bedell had had a part in the development of the bone conduction acousticon. The hearing aid sold by the Dictograph Com-

pany differed in form and size, being much smaller and more compact, so that it might be easily held in place back of the ear by a headband. This company had never manufactured or sold any bone conduction hearing aids before they made their contract with Prof. Bedell and the sale of the first bone conduction acousticon by the Dictograph Company was made in the latter part of September, 1933. Work on it had actually started in November, 1932, after the appellant's experts had been working all summer on the Bedell device.

It is conceded that the appellant never manufactured or sold the identical apparatus which Dr. Bedell had demonstrated before the National Academy of Sciences and which was exhibited to the representatives of the appellant at the time of the making of the contract. As a matter of fact neither party intended that this identical apparatus should be marketed or sold and the defendant's vice-president who was conducting the negotiations with Dr. Bedell stated that the apparatus in that form was not marketable and a considerable sum would have to be spent to put it in marketable condition. This fact was discussed by the parties before the execution of the contract. The device was, however, used as a model for work in the laboratories of appellant to produce the instrument that was commercially used and it is clear from the appellant's own admissions contained in their advertisements that they incorporated his new bone conduction method into a portable instrument and that from this and from consultation with him resulted the new amplified acousticon with perfected bone conduction. By their own statements they adopted and applied the principles of Dr. Bedell's instrument in their own new acousticon. The referee below found that the bone conduction acousticon manufactured and sold by the defendant performed substantially the same function as the plaintiff's invention in substantially the same way to obtain the same result. It is unnecessary here to go into an extended description of the mechanics by which these results were accomplished. Suffice it to say that upon all of the evidence we are satisfied that the apparatus which the appellant marketed and sold comes within the terms of the contract as a hearing aid employing bone conduction on which the appellant agreed to pay a royalty of five dollars each.

Appellant claims that the Bedell patent was not valid and that he had misrepresented that his apparatus was patentable. We are free to consider the validity of the patent as this is a collateral question subordinate to the issue of consideration in an action on contract. (*Herzog* v. *Heyman*, 151 N. Y. 587.) We have

first the fact that a patent was actually granted embodying one of his claims made in the application. The other claims had been rejected before the contract was made.

The issuance of a patent is *prima facie* proof that the patentee is the inventor of the patented article. (*Henry & Wright Mfg. Co.* v. *Rogers*, 136 Misc. 178.) Letters patent are *prima facie* evidence of priority and novelty of the invention. (*Seed Filter & Mfg. Co., Inc.,* v. *Stocking*, 172 App. Div. 726.) Defendant might easily have ascertained the status of the application before the contract was signed. Dr. Bedell testified and the referee found that his patent papers and all experimental equipment were produced by him and available for inspection during the interviews which preceded the making of the contract. The parties contracted with relation to the then pending patent application and as soon as the contract was executed, appellant took over the prosecution of the application and carried it through to the final granting of the patent. Immediately after the letters patent were issued Dr. Bedell assigned them to the manufacturer who kept them for several months before returning them to Dr. Bedell. It then knew the exact status of the application and made no protest or complaint. It continued to avail itself of Dr. Bedell's services as a consultant and to use his apparatus for laboratory purposes and continued its efforts to improve upon it. Also it made the monthly payments. Finally it marketed its first bone conduction hearing aid as the result of this consultation and development. Little weight should be attached, therefore, to its belated claim that the Bedell patent was invalid and that it did not use his invention. Professor Ballard found the defendant's bone conduction acousticon embodied the same principles and accomplished the same result. And there is no proof of the acquisition by appellant of rights under any other patent or of the taking out of any other patent by it either before or after it began to sell its new bone conduction acousticon.

We find here no sufficient reason for disturbing the judgment of the court below and it should be affirmed, with costs.

HILL, P. J., and McNAMEE, J., concur; HEFFERNAN, J., concurs in the result; CRAPSER, J., dissents, with a memorandum.

CRAPSER, J. (dissenting). I dissent and vote to modify the judgment appealed from by reversing that part of the judgment based upon royalties of five dollars for each hearing aid device sold by the defendant, and as so modified to affirm said judgment.

Judgment affirmed, with costs.